# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

TERRORIST ATTACKS ON SEPTEMBER 11, 2001

MEMORANDUM DECISION AND ORDER

03 MDL 1570 (GBD) (SN)

GEORGE B. DANIELS, United States District Judge:

In early July 2021, Kreindler & Kreindler LLP consultant John Fawcett sent a confidential deposition transcript to *Yahoo! News* reporter Michael Isikoff, in violation of multiple Court Orders. The law firm of Kreindler & Kreindler subsequently made repeated false and misleading statements to the Court regarding the firm's involvement in the breach, falsely attesting to a comprehensive investigation which in fact had not been conducted. They conducted a totally inadequate investigation that failed to question the two most obvious suspects who the firm knew had longstanding ties to the reporter: John Fawcett and lead partner James Kreindler ("Kreindler").

Magistrate Judge Sarah Netburn held a two-day evidentiary hearing on November 1 and 2, 2021 to determine the nature and source of the leak and consequential sanctions. On September 21, 2022, Magistrate Judge Netburn issued an Opinion and Order sanctioning Kreindler & Kreindler by, *inter alia*, removing Kreindler & Kreindler attorneys from the Plaintiffs' Executive Committee ("PEC") for Personal Injury and Death Claims and requiring the firm to pay attorneys' fees and costs associated with the breach to Defendant Kingdom of Saudi Arabia. (Op. (the "Opinion"), ECF No. 8544.)[1] On October 25, 2022, Kreindler & Kreindler filed the instant

[1] Unless otherwise indicated, all docket numbers refer to the main docket sheet for this multidistrict litigation. *See In re Terrorist Attacks on September 11, 2001,* No. 03-md-1570. As in the Magistrate Judge's Opinion, this Court refers to the voluminous and duplicative exhibits by citing either Saudi Arabia's or Kreindler & Kreindler's file-naming convention, (*i.e.*, "KSAX" or "K&K," respectively).

objections to the Opinion pursuant to Federal Rule of Civil Procedure 72(a). ("Objections," ECF No. 8681.) For the reasons stated herein, Kreindler & Kreindler's Objections to the Opinion are OVERRULED. The Order to remove the Kreindler & Kreindler lawyers from the PECs, and the imposition of attorneys' fees and costs, is CONFIRMED.

## I. BACKGROUND[2]

### A. The Case Management Order and Protective Orders in This Multidistrict Litigation

This multidistrict litigation involves over 300 separate personal injury cases and thousands of Plaintiff victims. In order to help coordinate this complex multidistrict litigation stemming from the terrorist attacks of September 11, 2001 ("9/11 Attacks"), Judge Richard Conway Casey in 2004 created a Plaintiffs' General Steering Committee, which operates through two Plaintiffs' Executive Committees: one for personal injury and death claims and the other for commercial claims. (*See* Case Management Order No. 3, ECF No. 248, ¶ 1.) The PECs serve to coordinate discovery, file common motions, and "promote the orderly and efficient conduct of this litigation" on behalf of all Plaintiffs in all cases. (*Id.* ¶¶ 11–12.) In his order, Judge Casey designated individual attorneys from Kreindler & Kreindler to the PEC for Personal Injury and Death Claims, namely: James P. Kreindler, "Justin T. Green or Andrew J. Maloney," and Marc S. Moller. (*See id.* ¶ 6.)

This Court entered its first protective order for discovery in this case on October 3, 2006, under Rule 26(c) of the Federal Rules of Civil Procedure. (*See* the "General Protective Order," KSAX-0002, ECF No. 1900.) Due to the potential prejudicial effect of parties disclosing information that is private or immaterial to the 9/11 Attacks, the General Protective Order defines "Confidential Information or Material" and "Protected Material" as any disclosure or discovery

[2] The factual and procedural background of this case has been discussed at length in Magistrate Judge Netburn's Opinion. Except for minor distinctions made in this Decision, this Court summarizes and appropriately incorporates such background by reference.

material designated as confidential by a party under its terms. (*Id.* at 7.) Parties may use such designated materials only in the defense or prosecution of this litigation. (*Id.* at 8.) Deposition transcripts involving confidential information (as designated by a party) are treated as confidential for at least 30 days from when a party receives them from the court reporter. (*See id.* at 10.)

On November 14, 2018, the Court entered a second order covering the use of information produced by the Federal Bureau of Investigation ("FBI"). ("FBI Protective Order," ECF No. 4255.) Similar to the General Protective Order, the FBI Protective Order limits the use of protected material produced by the FBI to prosecuting or defending this litigation and prohibits its dissemination to the public. (Op. at 4 (citing FBI Protective Order at 2, 5).) If a transcript involves material subject to the FBI Protective Order, the whole transcript is treated as confidential for at least 30 days. (FBI Protective Order at 5.)

Kreindler & Kreindler has exhibited a persistent, deep-seated animosity toward the Protective Orders. James Kreindler, the firm's senior attorney supervising the firm's work on this case, has publicly described the Protective Orders as "gag orders," "disgusting," the "hated protective order," "these disgusting protective orders imposed upon us by the Department of Justice with the blessing of the court," and "a damn gag order imposed on us by the Saudis, our Department of Justice, and the court." (Op. at 5 (quoting Hr'g Tr., ECF Nos. 7347 and 7349, 29:1–25).)[3] "Andrew Maloney, a Kreindler & Kreindler partner, stated that the entire Kreindler & Kreindler team hates the Protective Orders." (*Id.* (citing Hr'g Tr. 210:7–14).)

**B. Kreindler & Kreindler's 2017 Breach of the General Protective Order**

Kreindler & Kreindler personnel first breached the General Protective Order in 2017, and information from a confidential discovery document appeared in a *Politico* article. (*See* May 8,

---

[3] Unless otherwise noted, "Hr'g Tr." refers to the transcripts for the evidentiary hearings regarding this breach held before Magistrate Judge Netburn on November 1 and 2, 2021.

2017 Hr'g Tr., ECF No. 3619.) Kreindler & Kreindler consultant John Fawcett had described to a reporter how the firm used the confidential document and a phone number in it to advance the firm's investigation. (*Id.* at 4:6–6:5.) Before and after this breach, Fawcett had supported all aspects of Kreindler & Kreindler's work in the 9/11 litigation as a researcher, investigator, and manager of the firm's press relations for nearly 20 years. (Hr'g Tr. 312:1–3, 416:3–5.) "He had a Kreindler & Kreindler email address, phone, and office and the same email and login privileges as any employee," with 80 to 90 percent of his income coming from the firm. (Op. at 7 (citing Hr'g Tr. 148:14–149:6, 416:9–11).) The only other person from the firm to speak to the reporter for the *Politico* article was James Kreindler. (Hr'g Tr. 38:3–8.)

As a result of this breach, the Court did not order sanctions but instead used the violation as an opportunity to issue a "first warning" against such conduct. (May 8, 2017 Hr'g Tr. 10:2–3.) The Court urged James Kreindler to "be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee . . . ." (*Id.* at 13:12–15.) For its part, Kreindler & Kreindler took no disciplinary action against Fawcett, nor did it limit his access to confidential materials or restrict his ability to speak to the press. (Op. at 5–6 (citing Hr'g Tr. 38:12–24, 40:19–24).)

**C. The Leak of the Deposition Transcript on July 5, 2021**

Kreindler & Kreindler's media campaign continued apace, up to and beyond the leak at issue. "In addition to representing its clients in court, [the firm] lobbies Congress and the Executive branch and aggressively promotes its litigation narrative in the press." (*Id.* at 1.) Fawcett's press work for Kreindler & Kreindler included repeated contacts with *Yahoo! News* reporter Michael Isikoff. (*Id.* at 7.) Attorney Kreindler also spoke sporadically to Isikoff about this multidistrict litigation for years, (Hr'g Tr. 50:20–25), including for an interview that Isikoff described in a March 1, 2021 news article, (KSAX-0079, ECF 8768-65, at 2).

On June 17 and 18, 2021, Kreindler & Kreindler partner Megan Benett deposed Musaed Al Jarrah, a former official at the Saudi Arabian Embassy in Washington, D.C. (*See* Objections at 4.) The deposition transcript was designated confidential under the governing Protective Orders and was presumptively confidential for at least 30 days after the deposition. (*Id.* at 4 (citing Protective Orders).)

Around the same time, staff for Isikoff asked Attorney Kreindler to join him as a guest on Isikoff's podcast *Conspiracyland*. (John Hartney Decl., ECF No. 7147-6, at 6.) Fawcett was also in contact with Isikoff during this period. (Hr'g Tr. 427:10–21.) On June 21, 25, and 28, 2021, Attorney Kreindler communicated directly with Isikoff. (Op. at 8 (citing KSAX-0142, ECF No. 8768-93).) Specifically, on June 28, he spoke with Isikoff about the Al Jarrah deposition. Attorney Kreindler later testified that he told Isikoff that he would ask the team if any portion of the transcript could be disclosed. (*Id.* at 9.) That same day, Attorney Kreindler communicated with Fawcett twice, (*id.* at 8 (citing KSAX-0134, ECF No. 8768-88)), allegedly asking Fawcett if they could provide any part of the Al Jarrah deposition transcript to Isikoff, to which Fawcett appropriately replied no, (*id.* at 9 (citing Hr'g Tr. 61:19–62:9)).

On July 1, 2021, Jim Kreindler participated in the taping of Isikoff's podcast *Conspiracyland*. (*See* Hr'g Tr. 427:10–21).) Attorney Kreindler discussed on the podcast where things stood with the case against Saudi Arabia, including general discussion of the depositions of Omar al Bayoumi, Fahad al Thumairy, and Al Jarrah.[4] (Objections at 5 (citing 7/29/21 Letter to Magistrate Judge Netburn from Saudi Arabia, ECF No. 8000, at 2).) In one exchange with Isikoff, Jim Kreindler criticized the Justice Department's alleged written responses to unsuccessful

[4] Magistrate Judge Netburn deemed Attorney Kreindler's statements on the podcast to be "generic assertions" lacking the specificity that is necessary to breach the Protective Orders and did not consider them in formulating her decision to sanction the firm's attorneys. (Op. at 6 n.4.)

document requests in this case, to which Isikoff replied, "Alright, send me that and we'll post it on the *Yahoo* website." (*See Conspiracyland* Podcast Tr., KSAX-0039, ECF No. 8768-46, at 37:50–38:58.) Kreindler & Kreindler consultant Catherine Hunt also participated in both the Al Jarrah deposition and the podcast taping. (Op. at 12 (citing Hr'g Tr. 198:25–199:6, 205:14–206:16).)

In the immediate days after the podcast taping, Fawcett, Kreindler, and Isikoff had a flurry of communications that culminated in the leak of the Al Jarrah deposition transcript. (*See id.* at 8–10.) On July 2, 2021, Jim Kreindler and Fawcett had an 18-minute phone call. (Hr'g Tr. 63:25–64:16.) The following day, Fawcett and Isikoff communicated via phone and the Signal messaging application multiple times, with the first call at 1:53 p.m. lasting 22 minutes. (Op. at 10 (citing KSAX-0082, ECF No. 8768-66; KSAX-0134).) Then, on July 5, 2021, Fawcett and Isikoff communicated again via Signal, using both the Signal application's call and messaging features. (*Id.* (citing KSAX-0082; KSAX-0134).) The parties agree that Fawcett likely emailed the Al Jarrah transcript to Isikoff that day. (*Id.*; *see also* Objections at 5.) Fawcett had "saved [the transcript] onto a thumb drive" from an office computer; "took the thumb drive home"; and "used a personal email account [he] established on ProtonMail," an encrypted end-to-end email service, "to send the transcript [to Isikoff]." (Objections at 5 (quoting 9/30/21 John Fawcett Decl., ECF No. 7162-2, ¶¶ 7–9).) Fawcett claimed that he called Isikoff after sending the transcript to convey that he was "worried" that Jim Kreindler might be suspected in the leak because of Jim Kreindler's participation in the podcast with Isikoff. (*See id.* (citing 9/30/21 Fawcett Decl. ¶ 8).)

The same day, on July 5, 2021, Isikoff emailed counsel for Saudi Arabia Michael Kellogg to convey that he was "doing a story on the state of the 9/11 lawsuit" and ask whether Kellogg wanted to comment "in response to what Jim Kreindler had to say about where things stand – and

how the depositions went." (*See* KSAX-0041A, ECF No. 6981-4, at 10).) In his email, Isikoff included the following Jim Kreindler quote from the podcast that had been taped but not yet broadcast: "If I could tell you now everything we knew about the Saudi role, you could see a resolution in Congress to declare war. I mean, it is so dramatic[.] . . . 'We are thrilled with how the depositions went[]. I can say that we've exposed all kinds of lies. You know, one witness will contradict another. Each person wants to minimize their own role and point fingers at each other.'" (*Id.* (errors in original).) Isikoff's *Conspiracyland* podcast with guest Jim Kreindler aired on July 10, 2021. (Op. at 7.)

Fawcett, Jim Kreindler, and Isikoff's communications continued in the subsequent days after Fawcett had sent Isikoff the Al Jarrah transcript. On July 12, 2021, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that had been withheld by the Department of Justice on privilege grounds, with nothing in the body of the email. (*Id.* at 11 (citing Hartney Decl. at 13–23).) Jim Kreindler testified that he knew Fawcett had sent Isikoff the privilege log and that Fawcett "[p]robably" did so at his instruction.[5] (*See id.* at 11 (citing Hr'g Tr. 66:3–21).) Then, on July 13, 2021, Jim Kreindler and Isikoff exchanged multiple emails regarding Kreindler's "request to DOJ to lift the state secrets privilege and gag order." (Hartney Decl. at 24–27.) Isikoff added that he was "aiming to write something for Thursday[, July 15, 2021,] or Friday -- so if any update by then, let me know." (*Id.* at 26.) Jim Kreindler replied, "Will do." (*Id.* at 27.)

The leak became apparent to all parties and the Court on July 15, 2021. That day, Isikoff published his article on *Yahoo! News* titled "FBI Tried to Flip Saudi Official in 9/11 Investigation" based on the Al Jarrah transcript provided by Fawcett. (KSAX-0040, ECF No. 8768-47.) Isikoff

[5] Kreindler & Kreindler partner Megan Benett, however, contradicted this testimony, testifying that on September 27, 2021, Kreindler had told her that he was "*not aware* that Fawcett had sent the privilege log back in July." (Op. at 11 (citing Hr'g Tr. 387:3–6) (emphasis added).)

wrote that the FBI had allegedly confronted Al Jarrah with "child pornography" found on his laptop in an effort to get Al Jarrah to cooperate with their 9/11 investigation. (*See id.*) The article stated that "a copy of the [Al Jarrah] deposition – with some redactions for law-enforcement sensitive material – was obtained exclusively by Yahoo News." (*Id.* at 1.)

**D. Kreindler & Kreindler's Initial Investigation**

On or about July 15, 2021, the day *Yahoo! News* published the article, Kreindler & Kreindler attorneys held a conference call, in which Fawcett attended. They discussed "[w]hether anybody knew anything about how Mr. Isikoff had got[ten] the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff about the Jarrah deposition." (Hr'g Tr. 278:17–21 (Maloney).) No one confessed at that time. Kreindler & Kreindler partner Andrew Maloney and other firm lawyers finished the call purportedly "confident" that "no one," including Fawcett, "had sent the transcript" to Isikoff or "knew how he got it." (Objections at 6 (quoting Hr'g Tr. 212:3–5, 216:5–11, 278:22–24 (Maloney); also quoting Hr'g Tr. 123:18–21 (Kreindler)).)

From July 15 to 29, 2021, Maloney led Kreindler & Kreindler's investigation into the leak. (Op. at 12.) Maloney is a former federal prosecutor from the U.S. Attorney's Office for the Southern District of New York with experience conducting comprehensive investigations. (*Id.*) However, "[t]here was no witness list or systematic effort to determine who had access to the transcript and who should be interviewed." (*Id.*) Instead, Maloney began by informally and collectively asking a group of people associated with the case if they knew who leaked the transcript. He did not ask anyone whether they had any contact with Isikoff. (*Id.* (citing Hr'g Tr. 215:17–25).) He later spoke to some individuals at the firm one-on-one; he spoke with Jim Kreindler only by phone. (*Id.* (citing Hr'g Tr. 216:2–23).) Maloney never interviewed Catherine Hunt, the Kreindler & Kreindler consultant who participated in both the Al Jarrah deposition and the *Conspiracyland* podcast with Isikoff and Kreindler. (*Id.* (citing Hr'g Tr. 198:25–199:6,

205:14–206:16).) Fawcett does not recall anyone from Kreindler & Kreindler questioning him about leaking the transcript, although Maloney and firm counsel Steven Pounian say they did ask him face-to-face. (*Id.* at 12–13 (citing Hr'g Tr. 216:24–217:6, 407:6–21, 439:1–12).) The investigation never focused on the two primary suspects—Jim Kreindler and Fawcett, both of whom had a close relationship with Isikoff and had recently communicated with him.

On July 21, 2021 at 9:14 p.m., six days after Isikoff published his article, Saudi Arabia emailed the PECs stating that it would ask the Court to order discovery into the leak. (KSAX-0042, ECF No. 8768-49, at 3–4.) Fawcett was not included on this email. (*Id.*) The following morning of July 22 at 8:18 a.m., however, Fawcett texted criminal defense attorney Elizabeth Crotty, requesting legal advice. (KSAX-0151, ECF 8768-95, at 1.) Later that morning on July 22 at 9:17 a.m., Fawcett had a 46-minute call with Jim Kreindler. (Op. at 17 (citing KSAX-0135, ECF 8768-89, at 3).) Fawcett and Kreindler previously insisted that they could not recall the purpose of this 9:17 a.m. call, "except to assert with absolute confidence that it was not about the leak." (*Id.* (citing Hr'g Tr. 84:3–19 (Kreindler), 445:18–447:1 (Fawcett)).) Kreindler & Kreindler now claims that Fawcett had joined a "conference call" with Pounian and Kreindler to discuss various case issues, including that Pounian would coordinate with the other PEC firms concerning the response to Saudi Arabia's email. (Objections at 8 (citing Steven Pounian Del., ECF 7359-1, ¶ 4).)[6] This more-recent testimony contradicts previous statements from Fawcett and Jim Kreindler because Saudi Arabia's email was explicitly about the leak, so coordinating a "response to Saudi Arabia's email" necessarily concerns the leak.

Later that morning, on July 22 at 10:41 a.m., Fawcett had a 22-minute call with Crotty and then emailed her at 12:07 p.m. again for legal advice. (Op. at 18 (citing KSAX-0151 at 1).)

[6] Kreindler & Kreindler's counsel argue that "the Magistrate Judge improperly refused to admit this evidence regarding the conference call." (Objections at 8 n.3.)

Fawcett initially testified that his call with Crotty was about her recent run for district attorney and nothing else. (*Id.* (citing Hr'g Tr. 449:16–20).) On cross-examination, Saudi Arabia's counsel pressed Fawcett as to why he asserted attorney-client privilege over a personal phone call. (*Id.* (citing Hr'g Tr. 449:21–451:4).) After cross-examination and a recess, Fawcett changed his testimony, stating that he spoke to Crotty because he "saw the court order" and needed legal advice because of his responsibility for the leak. (Hr'g Tr. 480:5–481:9).) However, no court order had yet been issued. That afternoon of July 22 at 12:56 p.m., Fawcett again called Jim Kreindler. (Op. at 18 (citing KSAX-0135 at 3).)

On July 29, 2021, Maloney instructed John Hartney, Kreindler & Kreindler's head of information technology, to conduct follow-up email server searches. (*Id.* at 12 (citing Hr'g Tr. 172:14–24).) Those searches revealed only two instances of the Al Jarrah transcript leaving the firm: a Kreindler & Kreindler paralegal sent it to an authorized co-counsel at Baumeister & Samuels P.C., and Fawcett sent it to an authorized consultant living abroad. (Objections at 7 (citing Hr'g Tr. 290:14–291:2, 407:23–408:1).) Maloney spoke to the authorized consultant to verify that the consultant had not sent the transcript to Isikoff. (*Id.* (citing Hr'g Tr. 291:24–292:7).) Initial searches of the Kreindler & Kreindler systems also revealed the email exchange between Isikoff's staff and Jim Kreindler regarding Kreindler's upcoming appearance on the *Conspiracyland* podcast and Isikoff's inquiry to Attorney Kreindler about the "gag order." (*See* K&K-0009, ECF No. 8768-7; K&K-0008, ECF No. 8768-6.)

Around this time, Pounian "did his own internal checks with Kreindler & Kreindler personnel" because he was similarly "very concerned about nailing down exactly what had happened with the transcript" and "wanted to determine if the transcript had left the law firm in any way, shape or form." (Objections at 6–7 (quoting Hr'g Tr. 406:2–3, 406:23–24 (Pounian)).)

Fawcett allegedly lied to Pounian "to [his] face" that "he knew nothing about" the leak. (*Id.* at 7–8 (quoting Hr'g Tr. 407:8–408:4).)

Kreindler & Kreindler's internal investigation of the leak did not locate any of the private communications between Jim Kreindler and Isikoff or Fawcett and Isikoff. Nor did either of them volunteer any information about their recent contacts with Isikoff. These communications were uncovered only when the firm retained outside counsel following Fawcett's confession to the leak in September 2021. (Op. at 10.)

**E. The Court Compels Kreindler & Kreindler**

On July 23, 2021, Saudi Arabia filed its motion for discovery into the handling of the Al Jarrah transcript, as well as the transcripts of the depositions of Bayoumi and Thumairy. (Letter Mot. for Disc., ECF No. 6981.) Saudi Arabia recommended that the Court investigate by ordering declarations from every party who had access to the Al Jarrah transcript, followed by implementing sanctions under Federal Rule 37 of Civil Procedure and under the Court's inherent powers. (Op. at 19 (citing Letter Mot. for Disc. at 4).) Saudi Arabia submitted 27 declarations from its attorneys and staff that stated each declarant had not disclosed the Al Jarrah transcript, "did not know who did, and either had no interactions with Isikoff or had been contacted by him for a comment but had not communicated with him." (*Id.* (citing Decls., ECF No. 6981-4).)

On July 27, the PECs, including Kreindler & Kreindler, opposed Saudi Arabia's motion. (Opp'n to Letter Mot., KSAX-0043, ECF No. 8768-49.) Their opposition letter stated that "each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff" and was "confident that it was not the source of the leak to Mr. Isikoff." (Op. at 19–20 (quoting Opp'n to Letter Mot. at 2).) Two days later on July 29, the other PEC firms of Cozen O'Connor and Motley Rice voluntarily submitted declarations from attorneys and firm staff, as well as their firms' IT specialists. (*Id.* at 20 (citing

KSAX-0044, ECF No. 6991; KSAX-0045, ECF No. 6992).) However, Kreindler & Kreindler made a "consensus decision" to file nothing until ordered to do so. (*Id.* at 21 (citing Hr'g Tr. 262:6–15).)

On August 12, 2021, Magistrate Judge Netburn ordered Kreindler & Kreindler to file declarations addressing "whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order," including, "[a]t a minimum," declarations from Kreindler, Pounian, Maloney, and Benett. (*Id.* (quoting Order, ECF No. 7011, at 2).) Kreindler & Kreindler subsequently filed declarations from those four attorneys alone on August 16. (*Id.* at 22 (citing Decls., KSAX-0048, ECF No. 7016).)

On August 30, 2021, Magistrate Judge Netburn found Kreindler & Kreindler's August 16 declarations deficient and ordered the firm to supplement them. (Aug. 30 Order, ECF No. 7082.) She directed each original declarant—Kreindler, Pounian, Maloney, and Benett—to disclose any communications with Isikoff and identify others who had access to the transcript, and for at least one attorney to describe the firm's investigation and attach communications with Isikoff. (Aug. 30 Order at 1–2.) She also required declarations from others with access to the transcript and a declaration from the head of Kreindler & Kreindler's IT department attesting that the firm had performed a "forensic analysis" to investigate the leak. (Op. at 23 (citing Aug. 30 Order at 2–3).)

Magistrate Judge Netburn stayed this Order on September 3 because Oath, Inc., which offers *Yahoo! News*, intervened to request that the Order be modified on First Amendment grounds. (Proposed Order to Show Cause, ECF Nos. 7094.) In the intervening period, on September 2, Kreindler & Kreindler had obtained one additional exculpatory declaration from a consultant, who stated that he had not been in touch with Isikoff or shared the Al Jarrah transcript

with any unauthorized parties. (Op. at 24.) While Oath's motion was pending, the remaining plaintiffs' firms, many not covered by the August 30 Order, filed further declarations disavowing their involvement in the leak. (*Id.* (citing 9/10/21 Letter to Magistrate Judge Netburn from PECs, ECF No. 7106).) In total, nine additional attorneys from eight firms submitted declarations, with similar submissions received later from defense firms and the court reporters for the Al Jarrah deposition. (*Id.* (citing 9/27/21 Letter to Magistrate Judge Netburn from Defs., ECF No. 7145).)

The Court denied Oath's motion as without merit on September 23, 2021. (Order, ECF No. 7134.) It ordered the Kreindler & Kreindler declarations required by the August 30 Order to be filed by September 27, 2021. (*Id.* at 24.) On or soon after September 23, Kreindler & Kreindler purportedly first asked Fawcett to file a sworn declaration. (Op. at 24 (Hr'g Tr. 454:9–455:20).) Benett emailed a group of Kreindler & Kreindler-affiliated people, including Fawcett, the following day to inform them that she was drafting their denial declarations about the leak. (*See* K&K-0051, ECF No. 8768-17.) She then emailed Pounian the draft declarations, which included Fawcett's. (*See* K&K-0062, ECF No. 8768-26.)

Between 10:00 and 10:30 a.m. on September 27, the day the declarations were due to the Court, Fawcett purportedly first confessed to Kreindler & Kreindler attorneys that he was responsible for the leak. (Op. at 26 (citing Hr'g Tr. 388:19–25).) Fawcett emailed Pounian and Benett a statement that he had drafted himself approximately two hours later. (*Id.* (citing Hr'g Tr. 456:7–15; also citing KSAX-0108, ECF No. 8768-75).) Benett and Pounian edited the declaration. (*Id.* at 27–28.) Pounian added false statements that "the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography" and that Fawcett "did not send any other portions of the deposition to Isikoff." (*Id.* at 27 (quoting KSAX-0109A, ECF No. 8768-78).) Through rounds of edits, Fawcett deleted the sentence, "Until

today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff had obtained the transcript," and replaced it with, "No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders." (*Id.* at 27–28 (citing KSAX-0121, ECF No. 8768-87, at 1).) Second, he changed the line "redacted portions of the deposition I sent to Michael Isikoff were *limited to* Musaed Al Jarrah's testimony about his possession of child pornography," to redactions portions "were *focused on* Musaed Al Jarrah's testimony about his possession of child pornography . . . ." (KSAX-0121 at 1 (emphases added).) Fawcett had in fact sent the whole deposition transcript, with limited redactions, to Isikoff. (Op. at 28 (citing Hr'g Tr. 461:6–22).)

On September 30, 2021, Fawcett submitted a second declaration with more details about his communications with Isikoff and the leak. (9/30/21 Fawcett Decl.) Neither Fawcett's first or second declaration included copies of Fawcett's communications with Isikoff, as required by the Court Order. (Op. at 30 (citing Fawcett Decls.).) Kreindler & Kreindler did not produce those communications until Magistrate Judge Netburn ordered further discovery.

**F. Post-Confession Procedural History**

On November 1 and 2, 2021, Magistrate Judge Netburn held an evidentiary hearing. (*See id.* at 30–31.) She informed the parties via Court Order that "[t]he purpose of the hearing [was] to render findings of fact in connection with the breach and to determine the appropriate remedies." (Oct. 4, 2021 Order, ECF No. 7167, at 1.) The Order also gave notice to the parties that potential remedies would include "removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York." (*Id.*) Magistrate Judge Netburn admitted the declarations of Kreindler, Maloney, Benett,

Pounian, Hartney, and Fawcett as their direct testimony, and counsel for Saudi Arabia cross-examined these six Kreindler & Kreindler firm witnesses. (*See* Op. at 30.)

At the hearing, Kreindler & Kreindler defended Fawcett's character, evidently paying for Fawcett's defense counsel in these proceedings. (*See id.* at 8 (citing Hr'g Tr. 415:21–416:2).) Jim Kreindler described Fawcett as "one of the most committed . . . and honest and trustworthy people I ever met." (Hr'g Tr. 128:14–15.) Crying on the witness stand, he said that only his own father could surpass Fawcett for honestly and nobility. (*See id.* at 128:24–129:1.) Pounian similarly described Fawcett as "a colleague and a peer," (*id*. at 411:23–412:2), who had never been the subject of a single complaint, (*id.* at 413:9–15). Maloney considered Fawcett an essential part of the litigation team, (*id*. at 215:12–16), and Benett called him a "tireless advocate for the family members" victimized by the 9/11 Attacks, (*id.* at 366:8–9).

On September 21, 2022, Magistrate Judge Sarah Netburn issued her 65-page Opinion and Order, concluding that Jim Kreindler, Fawcett, and the Kreindler & Kreindler law firm violated the Protective Orders. (*See* Op. at 34.) She found that the appropriate remedy under Federal Rule 37(b) was to remove Kreindler & Kreindler from the PECs, require the firm to pay the attorneys' fees and costs expended by Saudi Arabia in response to the leak, and to bar Fawcett from further participation in this multidistrict litigation.[7] (*Id.*)

In response, on October 4, 2022, Kreindler & Kreindler filed a motion by proposed order to show cause for a stay pending resolution of objections pursuant to Federal Rule of Civil Procedure 72(a). (Proposed Order to Show Cause with Emergency Relief, ECF No. 8607.) On October 17, 2022, this Court denied that motion as procedurally improper but granted oral argument as to the parties' forthcoming Rule 72 objections to Magistrate Judge Netburn's Opinion.

---

[7] Kreindler & Kreindler's Objections do not challenge the bar against John Fawcett, so this Court focuses on the Court's sanctions against Kreindler & Kreindler.

(Mem. Decision and Order, ECF No. 8642.) Kreindler & Kreindler subsequently filed its instant Rule 72 Objections, as well as a motion to stay nonmonetary sanctions pending resolution of its Objections, (Mot. to Stay, ECF No. 8700). This Court held oral argument on the Objections on December 8, 2022, denying Kreindler & Kreindler's motion to stay on January 12, 2023, (*see* Mem. Decision and Order, ECF No. 8828).

## II. LEGAL STANDARD

A district judge must modify or set aside only those parts of a magistrate judge's order related to nondispositive matters that are clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *see also Thomas v. Arn*, 474 U.S. 140, 149 (1985) ("Congress provided for a 'clearly erroneous or contrary to law' standard of review of a magistrate's disposition of certain pretrial matters in § 636(b)(1)(A)."). "A district court is justified in finding a magistrate judge's ruling 'clearly erroneous' where, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Highland Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 177 (S.D.N.Y. 2008) (citations omitted). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *MacNamara v. City of New York*, 249 F.R.D. 70, 77 (S.D.N.Y. 2008) (quotation marks and citations omitted).

This is a highly deferential standard, and the objector thus carries a heavy burden. *U2 Home Ent., Inc. v. Hong Wei Int'l Trading, Inc.*, No. 04 Civ. 6189, 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007); *see also Lugosch v. Congel*, 443 F. Supp. 2d 254, 276 (N.D.N.Y. 2006) (noting that particular deference is due where "the magistrate judge has been deeply involved in discovery matters in the case for years").

## III. KREINDLER & KREINDLER'S OBJECTIONS LACK MERIT

Upon review of the September 21, 2022 Opinion and entire record, this Court is left without a "definite and firm conviction that a mistake has been committed" as to Kreindler & Kreindler's culpability in violating the Protective Orders and the Opinion's determination on sanctions. *Highland Mgmt., L.P.I.*, 551 F. Supp. 2d at 177. The sanctions against Kreindler & Kreindler, including the immediate removal of the firms' attorneys from the PECs, were authorized as a matter of law and fully commensurate with the firm's misconduct.

### A. The Record Supports the Magistrate Judge's Conclusion that James Kreindler, if not Additional Kreindler & Kreindler Attorneys, Was Directly Involved in John Fawcett's Leak of the Al Jarrah Transcript

Magistrate Judge Netburn rejected James Kreindler's testimony that he only asked Fawcett about sending the Al Jarrah transcript to Isikoff but did not direct the leak. Kreindler's explanation that he told Isikoff he would find out whether he could disclose part of the Al Jarrah transcript, that he asked Fawcett, and that Fawcett said no was found to be highly implausible. (*See* Op. at 9 (citing Hr'g Tr. 61:19–62:9).) Such a conclusion requires accepting that Kreindler, an executive member of the PEC for 17 years, was "completely ignorant of the requirements of the Protective Orders" that made the transcript confidential for at least 30 days, and that "Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff." (*See id*. at 9, 38.) Magistrate Judge Netburn found that the only "reasonable inference is that the calls between Kreindler, Fawcett, and Isikoff were discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Orders." (*Id.* at 39.)

Thus, Magistrate Judge Netburn properly determined that James Kreindler at least had knowledge of or gave his tacit consent to Fawcett to leak the Al Jarrah transcript. Fawcett's "standard procedure" was to "s[eek] approval from senior Kreindler & Kreindler personnel before

providing materials to reporters," as he had done numerous times with other journalists. (*See id.* at 7 (citing Hr'g Tr. 209:3–5).) Additional evidence supported Kreindler's involvement, including the following: Kreindler & Kreindler held a substantial financial "motive for the leak" to try to induce Saudi Arabia into settlement, (*see id.* at 37); the "extreme reciprocal loyalty between Fawcett and Kreindler," (*id.* at 9); their modus operandi of "tag-team[ing]" journalists with confidential documents, (*id.* at 37–38); a series of "suspicious communications" between Attorney Kreindler, Fawcett, and Isikoff for which Jim Kreindler and Fawcett offered no "credible explanation," (*id.* at 38); and Kreindler & Kreindler's efforts to "resist[] the Court's investigation of the breach," (*id.* at 44).

Moreover, the only reasonable explanation as to Fawcett's behavior in the immediate days after Isikoff published his article is that Jim Kreindler or another person at the firm sought to cover up the leak. Fawcett was not a recipient of Saudi Arabia's July 21, 2021 email at 9:14 p.m. notifying the PECs that Saudi Arabia would seek a Court investigation into the leak. (KSAX-0042.) Yet, Fawcett initiated a burst of "suspicious communications" the following morning, to include texting a criminal defense lawyer at 8:18 a.m. for legal advice regarding his role in the breach and then having a 46-minute phone call with Jim Kreindler. (*See* Op. at 16–17.) The Magistrate Judge reasonably concluded that "someone inside the firm alerted Fawcett to the impending threat." (*Id.* at 39.)

While Fawcett and Jim Kreindler have insisted that their call was not about the leak, (*id.* at 17 (citing Hr'g Tr. 84:3–19 (Kreindler), 445:25–446:2 (Fawcett))), Pounian now claims he was on the call and it *was* about the leak, (*see* Objections at 8 (the call "concern[ed] the response to Saudi Arabia's [July 21] email").) Fawcett then alternated between calls with the criminal defense attorney and Jim Kreindler throughout the day. (*See* Op. at 38–39.) Magistrate Judge Netburn,

"[h]aving witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he confessed instantly when forced to sign a sworn statement," reasonably did "not find it credible that Fawcett could manage [the] kind of duplicity" required to switch between, on the one hand, receiving advice from a defense attorney about betraying Kreindler and, on the other, talking to this same longstanding friend and employer whom he sought to keep in the dark. (*See id.* at 19.) More importantly, Jim Kreindler took no action to voluntarily disclose the contacts, conversations, and relationships between himself, Fawcett, and Isikoff, which would have subjected them to greater scrutiny and likely uncovered the law firm's and its personnel's involvement in the leak.

**B. Kreindler & Kreindler's Investigation Was Grossly Deficient**

*1. Kreindler & Kreindler's Investigation Buried the Truth*

This dispute over the leak and subsequent sanctions have exposed significant evidence of the firm's misconduct, while issues concerning Kreindler & Kreindler's internal investigation remain unresolved. This Court has not been provided with what questions were asked of firm employees and what employees specifically answered during the investigation. Indeed, there is no evidence the firm conducted any real interrogation of witnesses, or that it used any evidence to test the witnesses' veracity. Firm employees were not asked, at least initially after the leak, whether they had any contact with Isikoff. (*Id.* at 12 (citing Hr'g Tr. 215:17–25).) Hunt also was never interviewed, despite her participation in both the Al Jarrah deposition and the Isikoff podcast with Jim Kreindler. (*Id.* at 39–40 (citing Hr'g Tr. 198:25–199:6, 205:14–206:16; also citing KSAX-0032, ECF No. 8768-44, at 6).) Moreover, Attorney Maloney, who was primarily responsible for the investigation, was still unaware that Hunt had appeared on the podcast when he testified at the Court's investigation in November 2021. (*Id.* at 12 (citing Hr'g Tr. 206:6–12).)

Kreindler & Kreindler could have conducted a thorough investigation on its own in July 2021, when the breach first surfaced, to discover how the transcript leaked. Isikoff aired a public

podcast interview with Jim Kreindler on July 10, received an email from John Fawcett's firm email on July 12, received multiple emails from Kreindler's firm email on July 13, and then published his article revealing the leak on July 15. (*See generally* App. Exs., ECF No. 8768.) This sequence of events over the span of five days was immediately discernible to anyone with adequate IT privileges at Kreindler & Kreindler. Nonetheless, Kreindler & Kreindler urges this Court to believe that the firm, staffed with experienced lawyers, was never able to discover who could have possibly sent Isikoff the confidential transcript. Fawcett testified that he did not recall being directly asked by anyone at the firm as to whether he had leaked the transcript to Isikoff. (Op. at 13 (citing Hr'g Tr. 439:1–12).) Regardless of who asked Fawcett what, the record is clear that no one at Kreindler & Kreindler asked Fawcett to sign a sworn statement until the "absolute deadline" under the Court's Orders (*i.e.*, the period from September 23 to 27, 2021), and then, when asked, Fawcett "confessed immediately." (*See id.* at 40.)

The firm's investigation neither gathered, examined, nor provided to the Court any specific facts or information about Kreindler's and Fawcett's contacts with Isikoff. No one was instructed to search Fawcett's personal devices, testifying that he believed this step would have been unreasonable. (*Id.* at 14 (citing Hr'g Tr. 233:22–25).) The firm should have revealed to the Court that both Kreindler and Fawcett had discussions with Isikoff and each other about whether Isikoff could have access to the transcript. Members of the firm ignored the glaring evidence that should have made Kreindler and Fawcett the primary suspects and instead engaged in, at best, minimal efforts designed to enable the firm to deny responsibility rather than to identify the culprit.

Magistrate Judge Netburn similarly drew on this evidence to deduce that Kreindler & Kreindler failed to conduct an adequate investigation in order to avoid discerning the truth. (*Id.* at 39–40.) The firm's attorneys knew how to conduct a proper and comprehensive investigation.

Instead, the firm's efforts were primarily focused on denials that the firm was responsible for the leak, relied only on informal questioning of firm personnel in groups, conducted minimal searches of firm software, failed to account for firm-wide access to the Al Jarrah transcript through the firm's "Case Media" system, and failed to inspect personal devices. (*See id*. at 12–16, 39–40.) Magistrate Judge Netburn thus came to the reasonable conclusion, after her evidentiary hearing and evaluation of all the evidence, that members of the firm either (a) wanted to remain "willfully unaware" of what a proper investigation would reveal or (b) was already aware and "active[ly] collu[ded] in a cover-up." (*Id*. at 39.)

There is clear and convincing evidence that Kreindler & Kreindler lacked any basis to represent to the Court in July and August 2021 that it had completed a thorough investigation, or that it could confidently conclude it was not involved in the leak. The most reasonable conclusion from the facts as they existed in the summer of 2021, immediately after Isikoff published his article, was that the leak came from Kreindler & Kreindler and most likely from Jim Kreindler, Fawcett, or both. Kreindler & Kreindler could have known these same facts immediately, had the firm completed the most basic level of due diligence. The firm had a legal duty under the Protective Orders to safeguard protected information, necessitating a meticulous investigation of any breach. But Kreindler & Kreindler refrained from taking any proactive measures, either due to its reckless indifference to the truth, conscious avoidance of unveiling its own wrongdoing, or active cover-up to protect John Fawcett and James Kreindler.

2. *Kreindler & Kreindler Made Numerous False and Misleading Representations to the Court During the Court's Inquiry into the Leak*

Considering the responsibility to investigate the source of the leak and the failure to disclose the incriminating evidence that existed, Kreindler & Kreindler's representations to the Court that the firm was not responsible for the breach were both false and misleading. The most

significant false or misleading statements found by the Magistrate Judge about the leak itself include that (1) Kreindler & Kreindler was not responsible for the breach, (2) no firm attorneys knew who was responsible for the breach until September 27, 2021, (3) Fawcett acted alone, (4) Fawcett acted purely from a personal motive, and (5) Fawcett had sent "portions" of the transcript to Isikoff that were "focused on" only child pornography allegations, even though Fawcett had sent the entire transcript to Isikoff. (*See id.* at 19–22, 26–28, 31, 39, 42.)

The Magistrate Judge also concluded that Kreindler & Kreindler made false and misleading statements regarding the firm's internal investigation. Such misrepresentations include that (1) the firm's investigation was "complete" by July 27, even though Hartney had not completed IT searches; (2) all individuals with "access" to the Al Jarrah transcript had filed declarations by September 27, 2021, even though all firm staff could access it through the Case Media system; (3) Hartney's declaration was his own, when in fact Benett had strongarmed Hartney into signing what he didn't find "truthful" because "[s]he d[id]n't want to tell the court that everyone [at Kreindler & Kreindler] has access to everything"; and (4) Hartney "did not find any evidence that the Jarrah transcripts had been downloaded[ or] printed," despite the inability of the firm's systems to find such evidence. (*See id.* at 16, 19–20, 25–28, 40; Hr'g Tr. 195:21–196:19 (Hartney).)

The Magistrate Judge also determined that Jim Kreindler himself made numerous misrepresentations to the Court regarding his firm's breach. Attorney Kreindler consistently "understate[d]" his interactions with Isikoff by omitting several text messages and a phone call, and then violated the Court's August 30 Order by failing to attach the record of their communications in his subsequent declaration. (*Id.* at 29 (citing Hr'g Tr. 54:17–25, 55:2–56:12).) When questioned about such glaring omissions, he testified that he did not check any records to prepare his declaration and relied only on memory. (*Id.* (citing Hr'g Tr. 51:15–52:11, 52:23–25).)

Never did he explain "why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders." (*Id.*)

Such deceit justifies Magistrate Judge Netburn's conclusion that several senior Kreindler & Kreindler attorneys "obstructed the [Court's] investigation" and made "knowingly misleading statements to the Court." (*See id.* at 2.) The minimal work that the firm did was to deny that anyone at the firm had been responsible for the leak—which of course was false—rather than figure out the truth of what had happened. In the words of Megan Benett, the firm chose a strategy of "sticking to . . . 'only answer[ing] what [Magistrate Judge Netburn] asked for'" because Benett was "so irritated" by the Court's scrutiny of her firm. (*See* K&K-0061, ECF No. 8768-25.) It was Magistrate Judge Netburn's "irritat[ing]" August 30, 2021 Order, not any proactive investigative steps by Kreindler & Kreindler, that ultimately forced John Fawcett to confess to the leak in writing and forced the firm's hand. As Jim Kreindler himself foreshadowed on Isikoff's podcast days before his firm leaked the transcript to Isikoff, "always the cover-up is worse than the initial [offense]." (*See Conspiracyland* Podcast Tr. 39:39–46.)

**C. This Court May Sanction Kreindler & Kreindler Attorneys Under Rule 37(b)**

Rule 37(b) authorizes sanctions for "[f]or [n]ot [o]beying a [d]iscovery [o]rder." Specifically, Rule 37(b)(2)(A) provides that, "[i]f a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31 (a)(4) – fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders." *See also City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2018 WL 1229730, at *4 (S.D.N.Y. Mar. 5, 2018) ("failure to abide by a protective order is sanctionable under Rule 37"); (Op. at 36 (citing same)).

A court may impose Rule 37(b) sanctions on a party's attorneys. *See, e.g.*, *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 102–03 (2d Cir. 1997) (sanctioning attorney for

violating court order); *Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (sanctioning attorney for discovery misconduct); *Copeland v. Rosen*, 194 F.R.D. 127, 133–34 (S.D.N.Y. 2000) (sanctioning attorney for willfully disobeying court orders), *remanded on other grounds*, 25 F. App'x 17 (2d Cir. 2001). Such attorney misconduct can warrant sanctions against an attorney's law firm as well. *See, e.g.*, *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486 (5th Cir. 2012) (upholding Rule 37(b)(2) sanctions against both attorney and law firm for violation of protective order).

The definition of "party" in this case's Protective Orders similarly includes a party's attorneys and law firm. The General Protective Order governs the use and disclosure of confidential information by any "Party," which it defines as "any party to this [multidistrict litigation], including all of its officers, directors, employees, *consultants*, retained experts, and *outside counsel (and their support staff)*." (General Protective Order ¶ II.B.1 (emphasis added).) Similarly, the FBI Protective Order states that the FBI produces documents to "Qualified Persons," which include "Members of the Plaintiffs' Executive Committees ('PECs'), and any support staff of such PEC members . . . , as well as attorneys who are members of the same law firm as a member of the PEC." (FBI Protective Order ¶ 6(i).)

Therefore, when Kreindler & Kreindler attorneys violated the Court's Protective Orders and obstructed the Court's investigation of the breach, the firm's actions were sanctionable under Rule 37. (*See* Op. at 36–37.)

**D. The Sanctions Against Kreindler & Kreindler Are Just Under Rule 37(b)**

"A district court has broad power to impose Rule 37(b) sanctions in response to abusive litigation practices." *Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam). "[T]he text of [Rule 37(b)(2)(A)] requires only that the district court's orders

be 'just.'"[8] *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (citation omitted). To be just, "the severity of sanction[s] must be commensurate with the non-compliance," *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 140 (2d Cir. 2007), and "weighed in light of the full record in the case," *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979). Four factors guide the Court's determination of proper sanctions: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance." *World Wide Polymers*, 694 F.3d at 159 (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)).

Using these four factors, Magistrate Judge Netburn appropriately determined that the monetary sanctions and removal of individual Kreindler & Kreindler attorneys from the PECs constituted a "just order" commensurate with the firm's misconduct. (*See* Op. at 45–59.) Most critically, Magistrate Judge Netburn properly concluded that Kreindler & Kreindler's violation was "willful" and "the result of deliberate coordination between Fawcett and Kreindler," while "the rest of the firm was, at best, willfully blind to this strategy." (*Id.* at 46.)

Kreindler & Kreindler's willful violations of the Protective Orders significantly harmed this multidistrict litigation. A protective order issued under Rule 26(c) plays a "vital function" in civil litigation "by encouraging full disclosure of all evidence that might conceivably be relevant." *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 295 (2d Cir. 1979). Isikoff's news article "has

---

[8] In arguing that Rule 37(b)(2)(A) does not authorize sanctions against a law firm, Kreindler & Kreindler mistakenly relies on *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988). (*See* Objections at 18–19.) That case construed former Rule 37(c), which is inapposite to the "just orders" authorized under Rule 37(b)(2)(A). *See Apex Oil*, 855 F.2d at 1013–14. Kreindler & Kreindler similarly relies on other, distinguishable case law that concerns the interpretation of Rule 11 or different provisions of Rule 37, not Rule 37(b). (*See* Objections at 17–19.)

permanently damaged the credibility of the Protective Orders as a tool for encouraging fulsome disclosure." (Op. at 51.) Entities in the case have also been harmed: Al Jarrah and Saudi Arabia have faced "gratuitous" attacks with information irrelevant to 9/11, (*see, e.g.*, *id.* at 33, 42), while "false information [injected] into the PECs' communication with the Court" has damaged the PECs' credibility, (*id.* at 58). Kreindler & Kreindler also harmed its own clients because its attorneys "diverted focus from their clients' case," (*id.*), consuming substantial Court resources in this "draining debacle," (*id.* at 50).

The Opinion's sanctions are also the most effective means of mitigating further noncompliance by Kreindler & Kreindler. (*See also* Jan. 12, 2023 Mem. Decision and Order.) Kreindler & Kreindler has shown a reckless disregard for this Court's Orders and a disdain for this Court's management of the complex multidistrict litigation, necessitating the removal of its attorneys from privileged positions of leadership. (*See also* Op. at 52 ("[T]his investigation has revealed an almost complete lack of respect for the Court and its orders.").) For example, while the current investigation of Kreindler & Kreindler's breach was occurring, the firm again violated the General Protective Order by posting an entire cache of discovery material from the United Kingdom's Metropolitan Police Service ("MPS") on a publicly accessible website in April 2022. (*See id.* at 33–34 (citing Jun. 2, 2022 Order, ECF No. 8066).) All parties were to use these materials only for the defense or prosecution of this case. (*See* General Protective Order at 8.) Magistrate Judge Netburn's June 2, 2022 Order regarding the use of the documents only for this litigation is thus confirmed in full, and Kreindler & Kreindler's separate objections to that Order, (*see* ECF No. 8114), are overruled. "As the 2017 [*Politico*] breach [and 2022 MPS breach] demonstrate[], admonishment has not deterred Kreindler & Kreindler from abusing the Protective Orders." (Op. at 48.) Lesser sanctions or additional warnings will not suffice.

### E. Beyond Rule 37, This Court Finds Ample Grounds to Modify Case Management Order No. 3 and Remove Kreindler & Kreindler Attorneys from the PECs

This Court has an inherent power to manage this 9/11 multidistrict litigation by ensuring that the PECs remain effective bodies advocating on behalf of all Plaintiffs. Kreindler & Kreindler has no permanent right to serve on the PECs, and its strained arguments on the theoretical limitations to Rule 37(b) miss the point. (*See* Objections at 15–21.) Federal statute empowers the court holding jurisdiction in a multidistrict litigation to conduct all pretrial proceedings. 28 U.S.C. § 1407(b); *see also In re Asbestos Litig.*, 963 F. Supp. 247, 251 (S.D.N.Y. 1997) (same). "The judge [in a complex litigation] will often need to appoint lead counsel or a committee of counsel to coordinate discovery and other pretrial preparation." *In re Zyprexa Prod. Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) (alteration in *In re Zyprexa*) (quoting Manual for Complex Litigation § 22.62 (4th ed. 2004)). This Court is thus responsible for ensuring the efficacy of the bodies representing the interests of all Plaintiffs.

This Court can and would remove Kreindler & Kreindler attorneys from the PECs through modification of the 2004 Case Management Order No. 3, independent from any authority under Rule 37. "[S]o long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir. 1982) (citation omitted). Through the 2004 Case Management Order, this Court put Kreindler & Kreindler attorneys on the PECs. (*See* Case Management Order No. 3, ¶ 6.) Through this Decision, this Court modifies that Order by affirming the removal of Kreindler & Kreindler attorneys from the PECs. This Court must be confident that the law firm attorneys at the helm of the PECs are law-abiding, trustworthy, and competent. Like Magistrate Judge Netburn, this Court "has lost faith in [Kreindler & Kreindler's] ability to conduct

this litigation responsibly and report honestly as a representative of all plaintiffs." (Op. at 55.) It is time for a change.

This Court is thus unwilling to restore a law firm's attorneys to leadership positions when the attorneys have abused their position of influence to the detriment of all Plaintiffs, and indeed their own clients. The remaining leaders on the PECs have consistently indicated their concurrence with Magistrate Judge Netburn's sanctions, going so far as to "dispute the veracity of the facts and characterizations as recited in Mr. Maloney's [Objections-related October 4, 2022] declaration." (*See* 10/11/22 Letter to Judge Daniels and Magistrate Judge Netburn from PECs, ECF No. 8620.) In terms of progressing this litigation, these PEC leaders are "confident that [they] have ample resources available to fulfill their obligations in this complex case" without Kreindler & Kreindler on the PECs. (*See* 10/4/22 Letter to Magistrate Judge Netburn from PECs, ECF No. 8603, at 2.) They have also reaffirmed their commitment to lead "this complex consolidation on behalf of *all* Plaintiffs." (10/11/22 Letter to Judge Daniels and Magistrate Judge Netburn from PECs (emphasis in original).) Their statements further demonstrate that Kreindler & Kreindler's removal was appropriate to advance Plaintiffs' claims and this case.

Therefore, to the extent Rule 37 could in any way be construed as an improper method for removing Kreindler & Kreindler attorneys from the PECs, this Court finds overwhelming justification for the removal through its wide discretion in managing this multidistrict litigation and its inherent power to modify Case Management Order No. 3. Kreindler & Kreindler's leak of the transcript, the lack of any meaningful investigation, and the numerous false statements submitted to this Court lead to the inevitable conclusion that Kreindler & Kreindler is no longer a responsible steward to advocate on behalf of all 9/11 personal injury and death or commercial claimants. The firm's relentless motions practice to fight these sanctions have required this Court

to conduct a repeated review of the record, which has only further exposed the justness of the sanctions and disseminated the truth of the firm's wrongdoing to a wider audience.

## IV. CONCLUSION

Kreindler & Kreindler's multiple violations of this Court's Protective Orders, inadequate investigation into the leak of the Al Jarrah transcript, obstruction of this Court's subsequent inquiry, and frivolous motions practice to evade accountability are sanctionable. The record indicates an intent by Kreindler & Kreindler to obfuscate and undermine the Court's management of this complex multidistrict litigation. Such misconduct warrants, in the least, the sanctions imposed by Magistrate Judge Netburn.[9] This Court will no longer entertain the distractions presented by Kreindler & Kreindler's misconduct and its resistance to the consequences of its own actions. (*See also* 10/11/22 Letter to Judge Daniels and Magistrate Judge Netburn from PECs (It is not "productive to engage in any further distractions created by the Kreindler firm.").) Particularly for a case that aims to resolve liability for the 9/11 Attacks, all Plaintiffs deserve counsel who respect the rule of law, and the American people deserve a court focused on the merits to close one of the most horrific chapters in American history.

Therefore, Kreindler & Kreindler's Rule 72 Objections to Magistrate Judge Netburn's Opinion, (ECF No. 8681), are OVERRULED. Kreindler & Kreindler's separate Objections regarding its MPS-related breach of the General Protective Order, (ECF No. 8114), are also OVERRULED. Magistrate Judge Netburn's Opinions and Orders, (ECF Nos. 8066 and 8544), are CONFIRMED. John Fawcett remains barred from further participation in this case. (Op. at 59.) Should a common benefit fund be established and the PEC members seek an award for their

[9] Further violations may subject Kreindler & Kreindler and its individual attorneys to more serious potential sanctions, as the Court previously identified. (*See* Op. at 30 (citing Oct. 4, 2021 Order).)

service, Kreindler & Kreindler attorneys are precluded from seeking any contribution for the PECs' work performed from July 5, 2021, when their firm undermined the PECs by leaking the transcript, onward. (*Id.* at 58–59.) Kreindler & Kreindler shall pay Saudi Arabia reasonable attorneys' fees and costs associated with investigating and addressing the breach of the Protective Orders, to be determined by the Magistrate Judge. (*Id.* at 59; *see also* Def.'s Mot. for Attorneys' Fees, ECF No. 8623.) Kreindler & Kreindler attorneys shall not serve on the PECs, including specifically the following removed firm attorneys: James P. Kreindler, Justin T. Green, Andrew J. Maloney, and Marc S. Moller. (*See* Case Management Order No. 3, ¶ 6.) This Court further confirms Magistrate Judge Netburn's denial of Kreindler & Kreindler's request to replace Justin T. Green with Steven R. Pounian and Marc S. Moller with Megan Wolfe Benett on the PECs.[10] (*See* Op. at 64 (denying request at ECF No. 7153).)

Dated: July 17, 2023
New York, New York

SO ORDERED.

George B. Daniels

GEORGE B. DANIELS
United States District Judge

[10] Attorneys from Kreindler & Kreindler may continue to advocate for their 9/11 clients, and the PECs may draw on Kreindler & Kreindler's assistance as any other Plaintiffs' firm assignment in this multidistrict litigation.