# No. 23-1170

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001

KREINDLER & KREINDLER LLP,
*Interested-Party-Appellant*,

KATHLEEN ASHTON, Individually, as a Surviving Spouse, as Personal Representative of the Estate of Thomas Ashton and as Administrator of the Estate of Thomas Ashton, deceased and on behalf of all survivors of Thomas Ashton,
*Plaintiff*,

v.

KINGDOM OF SAUDI ARABIA,
*Defendant-Appellee*,

*(Caption Continued On Inside Cover)*

On Appeal from the United States District Court for the Southern District of New York
No. 03-md-1570, The Honorable George B. Daniels

**BRIEF FOR APPELLEE KINGDOM OF SAUDI ARABIA**

Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900

September 19, 2024

*Attorneys for the Kingdom of Saudi Arabia*

*(Caption Continued From Cover)*

JOSEPHINE ALGER, Individually, as Personal Representative of the Estate of David D. Alger, as surviving Spouse of David D. Alger, Spouse of David D. Alger Deceased, Personal Representative of the Estate of David D. Alger, Deceased, as Co-Executor of the Estate of David D. Alger, deceased and on behalf of all of survivors of David D. Alger, ANGELICA ALLEN, Individually, as Administrator of the Estate of Eric Allen, deceased and on behalf of survivors of Eric Allen, as Personal Representative of the Estate of Eric Allen, as surviving Spouse of Eric Allen, Deceased, Personal Representative of the Estate of Eric Allen, Deceased and Spouse of 9/11 decedent Eric Allen, GEORGE ANDRUCKI, Individually, as Co-Administrator of the Estate of Jean Andrucki, deceased and on behalf of all survivors of Jean Andrucki and as Personal Representative of the Estate of Jean Andrucki, MARY ANDRUCKI, as Co-Administrator of the Estate of Jean Andrucki, deceased and on behalf of all survivors of Jean Andrucki,

*Plaintiffs*,

EGYPTIAN ISLAMIC JIHAD, YESLAM BINLADIN, MOHAMMED AL FAISAL AL SAUD, ABDULRAHMAN BIN MAHFOUZ, AFRICAN MUSLIM AGENCY,

*Defendants*.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ISSUES PRESENTED ........ 2

STATEMENT OF THE CASE ........ 3

STANDARD OF REVIEW ........ 26

SUMMARY OF ARGUMENT ........ 27

ARGUMENT ........ 28

I. This Court Lacks Appellate Jurisdiction ........ 28

  A. Rule 37 Attorney-Sanctions Orders Are Not Immediately Appealable ........ 29

  B. Orders Limiting the Role of Counsel in a Consolidated Action Are Not Immediately Appealable ........ 30

  C. Orders Sanctioning Attorneys for Protective-Order Violations Are Not Immediately Appealable ........ 32

  D. This Court May Exercise Hypothetical Jurisdiction, but Only To Affirm the Sanctions Order ........ 36

II. The District Court's Sanctions Were Authorized by Law ........ 37

  A. The District Court Had Authority Under Rule 37(b)(2)(A) To Sanction Kreindler & Kreindler ........ 37

  B. The District Court Had Inherent Power To Remove Kreindler & Kreindler from the PECs ........ 46

III. The Record Supports the District Court's Factual Findings .........................47

A. Kreindler Knew of or at Least Tacitly Consented to Fawcett's Actions .........................................................................48

B. Kreindler & Kreindler Failed To Conduct a Reasonable Investigation and Obstructed the Court's Investigation......................55

CONCLUSION ........................................................................................59

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Page

CASES

*Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298 (2d Cir. 2009) ..........................58

*ALBA Petróleos de El Salvador S.E.M. de C.V.*, *In re*, 82 F.4th 105 (2d Cir. 2023)........................................................................................31

*American Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670 (2d Cir. Apr. 6, 2000) ...............................................................................38

*AMR Servs. Corp. v. International Bhd. of Teamsters*, 821 F.2d 162 (2d Cir. 1987)........................................................................................52

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ..................................................26

*Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988)........................................................................................44

*Asbestos Litig.*, *In re*, 963 F. Supp. 247 (S.D.N.Y. 1997) ......................................46

*Butcher v. Wendt*, 975 F.3d 236 (2d Cir. 2020)......................................................36

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979) .................................................................38

*City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) ...................................................................33

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)................................28

*Copeland v. Rosen*, 194 F.R.D. 127 (S.D.N.Y. 2000), *remanded*, 25 F. App'x 17 (2d Cir. 2001) ................................................................39

*Cunningham v. Hamilton Cnty.*, 527 U.S. 198 (1999) ...........................2, 27, 28, 29, 31, 32, 33, 34, 35

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991) .................................................................22

*Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (2d Cir. 1971) ................................32

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997) ....27, 42

*Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332 (2d Cir. 1997) ....38

*General Motors LLC Ignition Switch Litig., In re*, 2016 WL 1441804 (S.D.N.Y. Apr. 12, 2016) ....47

*Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119 (3d Cir. 2009) ....45

*Hyman v. Brown*, 927 F.3d 639 (2d Cir. 2019) ....54

*Johns-Manville Corp., In re*, 824 F.2d 176 (2d Cir. 1987) ....31

*Koch v. Greenberg*, 2011 WL 4485975 (Sept. 28, 2011), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012) ....33

*Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013) ....30

*Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962) ....39

*Mahboob v. Educational Credit Mgmt. Corp.*, 2021 WL 7448532 (S.D. Cal. Mar. 31, 2021) ....42, 43

*Maples v. Thomas*, 565 U.S. 266 (2012) ....41

*Miller v. Metropolitan Life Ins. Co.*, 979 F.3d 118 (2d Cir. 2020) ....36

*New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp.*:

2000 WL 377513 (S.D.N.Y. Apr. 12, 2000), *appeal dismissed*, 252 F.3d 667 (2d Cir. 2001) ....30

252 F.3d 667 (2d Cir. 2001) ....27, 30, 32

*NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022) ....45

*O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101 (N.D. Cal. Aug. 31, 2017) ....43

*Palomo v. DeMaio*, 2018 WL 10323057 (N.D.N.Y. May 16, 2018) ....33

*Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985) ..............30, 31, 32, 34, 35

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)..........................................38, 39, 41

*SEC v. Smith*, 710 F.3d 87 (2d Cir. 2013) ...........................................................30

*Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657
(S.D.N.Y. June 6, 2017) ........................................................................38

*Smith v. Bradley Pizza, Inc.*, 2019 WL 430851 (Feb. 4, 2019),
*objections overruled*, 2019 WL 2448575 (D. Minn. June 12,
2019), *aff'd*, 821 F. App'x 656 (8th Cir. 2020) .....................................42, 43

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486
(5th Cir. 2012) ..........................................................................................38

*Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123
(2d Cir. 2010)............................................................................................26

*Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403 (2d Cir. 2022)............................37

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ..................................36

*Steward*, *In re*, 529 B.R. 903 (E.D. Mo. 2015), *aff'd*, 828 F.3d 672
(8th Cir. 2016) ..........................................................................................43

*Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219 (10th Cir. 2015)........................45

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004).......................................26, 48

*Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988) ................................................28

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004)............................... 46-47

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ....................................52

*Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216 (2d Cir. 2020)..........................46

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001) ............................26

*Zyprexa Prods. Liab. Litig.*, *In re*, 467 F. Supp. 2d 256
(E.D.N.Y. 2006)........................................................................................46

CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. III ........................................ 36

28 U.S.C. § 1291 ........................................ 27, 28, 36

28 U.S.C. § 1407(b) ........................................ 46

Fed. R. Civ. P.:

Rule 11(c) ........................................ 44

Rule 37 ........................................ 27, 28, 29, 32, 35, 39, 42

Rule 37(a) ........................................ 29, 30

Rule 37(b) ........................................ 2, 21, 27, 29, 30, 39, 42, 43, 44, 45, 47

Rule 37(b)(2) ........................................ 22, 33, 38

Rule 37(b)(2)(A) ........................................ 22, 37, 38, 43

Rule 37(c) (1987) ........................................ 44

Rule 37(c) ........................................ 44

Rule 37(d) ........................................ 45

Rule 37(d)(1)(A) ........................................ 45

Rule 37(d)(3) ........................................ 45

Rule 37(f) ........................................ 44

Rule 72(a) ........................................ 47

OTHER MATERIALS

David G. Knibb, *Federal Court of Appeals Manual* (7th ed. 2024) ........................................ 37

## INTRODUCTION

Kreindler & Kreindler LLP ("Kreindler & Kreindler") leaked a confidential deposition transcript to a reporter, violating two court orders. The firm then made false statements to the district court – first, denying any role in the leak, then, blaming John Fawcett, a low-level researcher. After a two-day evidentiary hearing, Magistrate Judge Netburn found that supervising attorney James Kreindler "deliberate[ly] coordinat[ed]" the breach and that Fawcett acted with Kreindler's "knowledge or at least tacit consent." SPA6, SPA50. She also found that other Kreindler & Kreindler attorneys, "at best, [made] efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active[ly] collu[ded] in a cover-up." SPA43. As sanctions, the district court removed Kreindler & Kreindler from the Plaintiffs' Executive Committees ("PECs") in the multi-district litigation arising from the September 11 terrorist attacks, ordered it to pay attorneys' fees, and limited its prospective ability to share in fee recoveries.

Kreindler & Kreindler now brings this interlocutory appeal from the district court's sanctions order. Although the Court lacks appellate jurisdiction, it may, if it chooses, affirm under the doctrine of hypothetical jurisdiction because the defect is statutory and not constitutional. Affirmance on the merits is straightforward. Magistrate Judge Netburn had ample basis in her personal credibility observations and in contemporaneous documentary evidence to find that Kreindler and his

cohorts lacked candor in protesting their innocence of the leak. Having made that finding, she (and Judge Daniels in adopting her order) had ample authority to impose sanctions. Kreindler & Kreindler's contention that law firms and lawyers are immune from sanctions under Federal Rule of Civil Procedure 37(b) lacks support in the Rule's language or in precedent. The district court's "los[s]" of "faith in Kreindler & Kreindler," SPA61, was well-justified, and it chose reasonable measures to protect the integrity of its processes.

## ISSUES PRESENTED

1. Whether, under *Cunningham v. Hamilton County*, 527 U.S. 198 (1999), and its progeny, the district court's order sanctioning Kreindler & Kreindler is immediately appealable as a collateral order.

2. Whether, if this Court's appellate jurisdiction is in doubt, it should exercise hypothetical appellate jurisdiction to affirm the district court's order.

3. Whether the district court had authority under Rule 37(b) to sanction Kreindler & Kreindler for violating that court's protective orders.

4. Whether, if the district court's Rule 37(b) authority is in doubt, the district court properly exercised its inherent authority to remove Kreindler & Kreindler from the PECs.

5. Whether Magistrate Judge Netburn clearly erred in her factual findings, made after a two-day evidentiary hearing and based on observation of witness testimony and on contemporaneous documentary evidence.

## STATEMENT OF THE CASE

**1.** This case is part of *In re Terrorist Attacks on September 11, 2001*, MDL No. 1570 (the "9/11 MDL"). The 9/11 MDL consists of more than 300 cases brought by the victims, or the survivors of victims, of the 9/11 terrorist attacks, as well as cases brought by commercial businesses and insurers. At present, there are more than 747 named defendants in the 9/11 MDL, including at least 5 foreign states, 172 businesses, 34 charities, and 460 individuals. The defendant relevant here is the Kingdom of Saudi Arabia ("Saudi Arabia"), which the 9/11 plaintiffs have accused of (but which vigorously denies) materially supporting the terrorists who committed the 9/11 attacks.

Within the 9/11 MDL, Kreindler & Kreindler represents the plaintiffs in *Ashton v. al Qaeda Islamic Army*, No. 1:02-cv-06977-GBD-SN, and other cases. From 2004 to September 21, 2022, the firm's attorneys served on the Plaintiffs' Executive Committee for Personal Injury and Death Claims, representing their own clients and speaking to the court on behalf of others. The leader of the Kreindler & Kreindler team is James Kreindler. SPA10. Other team attorneys include partner Andrew Maloney, a former federal prosecutor; partner Megan Benett; and counsel

Steven Pounian. The firm is working on a contingent-fee basis and expects a substantial recovery if it prevails. *Id.* (citing JA72-73 (Tr. 23:1-24:2)).

Researcher and investigator John Fawcett was part of the Kreindler & Kreindler team. For more than 20 years, Fawcett managed discovery materials and other documents for this case. SPA11 (citing JA89 (Tr. 40:5-9), JA465 (Tr. 416:12-18)); *see also* SPA44 (quoting Kreindler's testimony that Fawcett "was 'at the heart of the documents,'" JA88 (Tr. 39:3)). The firm gave Fawcett a Kreindler & Kreindler email address, phone, and office, and access to a proprietary internal computer server. SPA11 (citing JA197-198 (Tr. 148:8-10, 148:14-149:6)). Fawcett's work for Kreindler & Kreindler generated 80-90% of his income. *Id.* (citing JA465 (Tr. 416:9-11)). He had "substantial loyalty" to Kreindler & Kreindler and to James Kreindler personally, and the firm was loyal to him in return. *Id.* For example, "in a tearful moment at the evidentiary hearing, Kreindler said that only his own father could surpass Fawcett for honest[y] and nobility." SPA11-12 (citing JA177-178 (Tr. 128:24-129:1)). Maloney, Pounian, and Benett each also praised Fawcett. SPA12.

Kreindler & Kreindler "aggressively promotes its litigation narrative in the press," and doing so is a "central part" of the firm's litigation strategy – an effort to "pressure" Saudi Arabia into settling. SPA5, SPA10, SPA41 (citing JA74 (Tr. 25:3-5, 25:21-24)). Fawcett was "instrumental" in those efforts. SPA10. He

spoke to reporters and provided them with documents. SPA10-11. His "standard procedure" was to "s[eek] approval from senior Kreindler & Kreindler personnel before providing materials to reporters." SPA11 (citing JA258 (Tr. 209:3-5)).

**2.** The sanctions under review result from Kreindler & Kreindler's violations of two protective orders. The first order (the "MDL Protective Order") limits the use of discovery material produced by any party in the MDL, with special protections for information designated confidential. SPA7-8 (citing JA688). The second order (the "FBI Protective Order") protects information the FBI has designated confidential. SPA8 (citing JA728). Both orders prohibit disclosure of confidential information except to certain categories of individuals – mostly, attorneys and their staff. *Id.* Both protect all deposition transcripts discussing confidential information for at least 30 days to allow time for specific confidentiality designations. *Id.*

Because the protective orders limit what information Kreindler & Kreindler can disclose to the press, the Kreindler & Kreindler team "hates" the orders. SPA9 (citing JA259 (Tr. 210:7-14)). Kreindler has been "particularly vociferous" in his public attacks on the orders. *Id.* He has said that he is "'angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on.'" *Id.* (quoting JA78 (Tr. 29:18-21)). He has described the orders in "vitriolic terms" such as "'gag orders,'" "'disgusting,'" "'hated,'" and "'a damn gag order imposed

on us by the Saudis, our Department of Justice, and the court.'" SPA9, SPA41 (quoting JA78 (Tr. 29:1-25)).

In 2017, Kreindler & Kreindler breached the MDL Protective Order. SPA9. This breach occurred when Fawcett gave a reporter at *Politico* magazine a "specific description of a confidential document" while explaining how Kreindler & Kreindler used that document in its investigation. *Id.* (citing JA713-714 (Tr. 4:2-5:1), JA718 (Tr. 9:6-7)). Kreindler was the only person from his firm other than Fawcett who spoke to that reporter. *Id.* (citing JA87 (Tr. 38:3-8)). At that time, Judge Netburn issued a "'first warning,'" admonishing Kreindler to "'be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee.'" *Id.* (quoting JA719 (Tr. 10:2), JA722 (Tr. 13:12-15)). Kreindler & Kreindler took no action to prevent further violations: no discipline of Fawcett, no limits on his access to confidential information, and no restrictions on his interactions with the press. SPA9-10 (citing JA87 (Tr. 38:12-24), JA89 (Tr. 40:19-24)).

**3.** On June 17 and 18, 2021, Benett deposed Musaed Al Jarrah, a former official of Saudi Arabia. SPA12. Al Jarrah's deposition transcript was confidential under the protective orders. On June 21, 25, and 28, Kreindler spoke by phone with journalist Michael Isikoff of *Yahoo! News*. *Id.* Later on June 28, Kreindler spoke to Fawcett by phone. *Id.* On July 3, Fawcett and Isikoff had a 22-minute

call, followed by a flurry of calls and messages using the encrypted Signal application. SPA13-14. They spoke again on July 5. SPA14. Around that time, Fawcett sent the transcript to Isikoff, violating the court's orders. *Id.*

Kreindler and Fawcett testified that Fawcett acted alone and that Kreindler did not then know of the leak. The district court found otherwise. It weighed evidence including Kreindler & Kreindler's financial "motive for the leak," SPA41; the "extreme reciprocal loyalty between Fawcett and Kreindler," SPA13, SPA47; their past method of "tag-team[ing]" journalists with confidential documents, SPA41-42; the lack of a "credible explanation" for the phone call exchange on June 28, SPA42; and Kreindler & Kreindler's efforts (discussed below) to "resist[ ] the Court's investigation of the breach," SPA48.[1] Considering those facts, along with first-hand observation of the witnesses' testimony and demeanor, the court found that Fawcett sent the transcript "with [Kreindler's] knowledge or at least tacit consent" as part of a "coordinated campaign" in which Fawcett "t[ook] his direction from Kreindler." SPA6, SPA41, SPA48.

---

[1] Kreindler had testified that on the June 28 phone calls he told Isikoff that he would find out whether he could disclose part of the Al Jarrah transcript, that he asked Fawcett, and that Fawcett said no. SPA13 (citing JA110-111 (Tr. 61:19-62:9)). Judge Netburn rejected that explanation because it required her to accept both that Kreindler was "completely ignorant of the requirements of the Protective Orders," which made the transcript confidential for at least 30 days, and that "Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff." SPA13, SPA42.

After the leak, Kreindler and Fawcett each continued to communicate with Isikoff. SPA14. On July 10, 2021, Isikoff released an episode of his podcast *Conspiracyland* in which he and Kreindler discussed the 9/11 MDL. SPA10 n.4. On July 12, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that the Department of Justice ("DOJ") had withheld. SPA15. Kreindler testified that he knew Fawcett gave the log to Isikoff and that Fawcett "'[p]robably did so at his direction.'" *Id.* (quoting JA115 (Tr. 66:3-21)) (alteration in original). On July 13, Kreindler and Isikoff exchanged emails about Plaintiffs' "'request to DOJ to lift the state secrets privilege and gag order.'" *Id.* (quoting JA1093-1096).

On July 15, 2021, Isikoff published an article about Al Jarrah's deposition. *Id.* The article, titled "FBI Tried to Flip Saudi Official in 9/11 Investigation," revealed that Isikoff had the confidential deposition transcript. *Id.* It also contained statements that FBI agents had questioned Al Jarrah about alleged possession of child pornography.

**4.** Isikoff's article purportedly set off an "internal investigation" at Kreindler & Kreindler. SPA14. Maloney, the former prosecutor, conducted the purported investigation from July 15 to July 29. SPA16 (citing JA118-119 (Tr. 69:24-70:13), JA221 (Tr. 172:14-24)). Maloney testified that he began his investigation "confident" that Kreindler & Kreindler "wasn't the source of the leak." JA261 (Tr. 212:3-5); *see* SPA16, SPA43 (citing JA261 (Tr. 212:3-5),

JA261-262 (Tr. 212:25-213:6), JA268 (Tr. 219:20-25)). He made no lists of witnesses to interview or of questions to ask. SPA16, SPA43-44 (citing JA264 (Tr. 215:17-25)). He did not ask about contacts with Isikoff and did not speak with a Kreindler & Kreindler consultant who attended the Al Jarrah deposition and appeared on Isikoff's podcast. *Id.* (citing JA247-248 (Tr. 198:25-199:6), JA254-255 (Tr. 205:14-206:16), JA264 (Tr. 215:17-25)).

Maloney directed Kreindler & Kreindler's Local Area Network administrator, John Hartney, to conduct "a few searches for messages on the firm's email system." SPA44. He asked Hartney to search for emails to Isikoff and for outgoing emails from eight individuals with the transcript filename. SPA19 (citing JA270-272 (Tr. 221:1-222:17, 223:10-17), JA864). The searches found emails between Isikoff and Kreindler and between Isikoff and Fawcett. Some of those emails suggested earlier communications, but Maloney did not ask Hartney to find the earlier communications. SPA19-20 (citing JA211-212 (Tr. 162:12-163:6), JA284-287 (Tr. 235:17-236:17, 237:3-238:11)).

At the time of the leak and of its purported investigation, Kreindler & Kreindler stored the Al Jarrah deposition transcript on an internal server called "Case Media." Anyone at the firm could access that server, and therefore could access the transcript. SPA34-35. Neither Maloney nor Hartney tried to find out who had accessed the transcript using Case Media. SPA18-19, SPA44 (citing

JA187-188 (Tr. 138:18-139:8)). Some Kreindler & Kreindler employees and consultants could also access the transcript through a service called "Citrix ShareFile." Maloney directed Hartney to search ShareFile on July 29, 2021. SPA18-19, SPA20 (citing JA186 (Tr. 137:3-5), JA196 (Tr. 147:21-22), JA198-199 (Tr. 149:21-150:3)).

No one at Kreindler & Kreindler ever directly asked Fawcett whether he had leaked the transcript to Isikoff. Fawcett testified that he did not recall being asked that question. SPA17 (citing JA488 (Tr. 439:1-12)). Kreindler testified that he never asked Fawcett whether Fawcett had leaked the transcript, never directed anyone else to do so, and told Fawcett: "'I know you didn't do it.'" SPA17-18 (quoting JA127 (Tr. 78:7-9); citing JA127-128 (Tr. 78:22-79:3)). Although Maloney and Pounian each testified that they did ask Fawcett whether he leaked the transcript, SPA16-17 (citing JA265-266 (Tr. 216:24-217:6), JA456 (Tr. 407:6-21)), Judge Netburn did not credit their testimony.[2]

Attorneys at the firm knew Fawcett had communicated with Isikoff, but never checked whether Fawcett did so by means other than his firm email account.

---

[2] She reasoned that Fawcett, as the culprit, would likely recall being confronted, but Maloney and Pounian "approached the investigation confident that their firm was not the source." SPA17. She also doubted Pounian's testimony because he did not object when Fawcett later removed from a draft declaration language stating that he "'told Kreindler & Kreindler that [he] did not know how Michael Isikoff had obtained the transcript.'" SPA17, SPA44 (brackets in original); *see infra* p. 20.

SPA18. Hartney knew Fawcett used a cloud-based storage system called Dropbox to store documents, but did not investigate that Dropbox account. *Id.* (citing JA199 (Tr. 150:8-14)). Maloney never tried to search Fawcett's personal devices, testifying that he believed this would have been "unreasonable." *Id.* (citing JA282 (Tr. 233:22-25)).

**5.** On July 21, 2021, at 9:14 p.m., Saudi Arabia sent an email informing the PECs, including Kreindler & Kreindler, that it would ask the court to investigate the leak of the Al Jarrah transcript. SPA20 (citing JA874-875). Fawcett was not copied on this email. Judge Netburn found that, starting early the next morning, Fawcett began a burst of "suspicious communications" that came to light only after he and Kreindler & Kreindler later retained outside counsel, and were never assessed as part of the firm's purported internal investigation. SPA20-21 (citing JA900, JA1124). She inferred that "someone inside the firm alerted Fawcett to the impending threat." SPA22, SPA43.

On July 22, 2021, at 8:18 a.m., Fawcett texted Elizabeth Crotty, a criminal defense lawyer and former Kreindler & Kreindler attorney, seeking legal advice. SPA21 (citing JA1124). At 9:17 a.m., Fawcett had a 46-minute phone call with Kreindler. *Id.* (citing JA900). At 10:41 a.m., Fawcett called Crotty for 22 minutes. SPA22 (citing JA900). At 12:07 p.m., he emailed her, again seeking legal advice. *Id.* (citing JA1124). At 12:56 p.m., he again called Kreindler. *Id.* (citing JA900).

During discovery, Fawcett asserted attorney-client privilege over his July 22, 2021 communications with Crotty, *id.* (citing JA498 (Tr. 449:5-11)), but Kreindler & Kreindler did not assert work-product protection over Fawcett's 46-minute call with Kreindler, SPA21 (citing JA900).

Kreindler and Fawcett each testified that they could not remember the topic of their 46-minute phone call but were sure it was not the leak. *Id.* (citing JA133 (Tr. 84:3-19), JA494-495 (Tr. 445:25-446:2)). Fawcett suggested that the call might have been work-related. *Id.* (citing JA494-496 (Tr. 445:18-447:1)). When asked about his 10:41 a.m. call with Crotty, Fawcett first testified that it was not about the leak either; and that he and Crotty spoke only about her recent run for district attorney. SPA22 (citing JA498 (Tr. 449:16-20)). On cross-examination, counsel for Saudi Arabia pressed Fawcett about why he had asserted privilege over a personal phone call. *Id.* (citing JA498-500 (Tr. 449:21-451:4)). Fawcett stuck to his original answer. Then, after cross-examination and a recess, he corrected his testimony, stating that he spoke with Crotty because he "'saw the court order'" and needed legal advice about his responsibility for the leak. *Id.* (quoting JA529 (Tr. 480:16); citing JA530 (Tr. 481:6-9)).

Judge Netburn did not credit Fawcett's testimony that he called Crotty because he "saw the court order." *Id.* There was no court order about the breach as of July 22, 2021, the day Fawcett called Crotty. *Id.* There was only Saudi

Arabia's July 21 email to the PECs – copying Kreindler, Pounian, Benett, and Maloney, but not Fawcett – stating that Saudi Arabia would request a court-ordered investigation. *Id.* Thus, one of these attorneys must have told Fawcett of the email before the July 22 calls to Crotty. Judge Netburn also did not credit Fawcett's and Kreindler's testimony about their July 22 calls. SPA21, SPA23. She found that Fawcett's suggestion that his 9:17 a.m. call with Kreindler was a work-related conference call was belied by the fact that Kreindler & Kreindler asserted work-product protection over many other calls, but not that one. SPA21 (citing JA900). She also did not believe that Fawcett could manage the "duplicity" that his and Kreindler's version of events implied. SPA23. That is, crediting their testimonies would have required

> accept[ing] that, despite his long friendship with Kreindler, Fawcett reached out to a defense attorney about betraying Kreindler, had a normal, extended call with Kreindler, switched back to talking to his attorney about betraying Kreindler, and then talked to Kreindler again, all apparently without revealing a hint of his guilt.

*Id.* "Having witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he [later] confessed instantly when forced to sign a sworn statement," Judge Netburn found that such a maneuver would have exceeded his ability. *Id.*

**6.** On July 23, 2021, Saudi Arabia asked the court to order discovery into the breach of the protective orders, suggesting as a first step that everyone with access to the Al Jarrah transcript submit declarations. SPA23. The motion asked

the court to invoke Rule 37(b) and its inherent powers. *Id*. Saudi Arabia's counsel provided declarations from each attorney and staff member who had received or accessed the transcript, stating that: (i) the declarant had not leaked the transcript; (ii) did not know who did; and (iii) either had no communications with Isikoff or had been contacted by him for comment but did not respond. *Id.*

On July 27, 2021, the PECs, including Kreindler & Kreindler, opposed Saudi Arabia's motion. *Id.* (citing JA887). Their opposition letter stated that "'each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff'" and was "'confident that it was not the source of the leak to Mr. Isikoff.'" SPA23-24 (quoting JA887). Even leaving aside Kreindler's personal involvement, that statement was misleading: as Hartney later testified, when the letter was written, he "'could not have concluded that no one at the Kreindler firm was the source of the leak'" because his investigation was ongoing. SPA24 (quoting JA223-224 (Tr. 174:25-175:3)). For example, Maloney did not tell Hartney to review the ShareFile system until two days later. *Supra* p. 10.

On July 29, 2021, two other PEC firms – Cozen O'Connor and Motley Rice – voluntarily submitted declarations from attorneys, firm staff, and IT specialists. SPA24. Their declarations were "thorough," confirming no communications with Isikoff (at all, or after the deposition) and describing investigative steps taken to

determine that no one at the firm had given Isikoff the transcript. *Id.* Later, PEC firm Anderson Kill voluntarily submitted similar declarations. SPA25. Kreindler & Kreindler made a "'consensus decision'" to file nothing at that time. *Id.* (quoting JA311 (Tr. 262:6-15)).

On August 12, 2021, Judge Netburn ordered Kreindler & Kreindler to file declarations addressing "'whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order,'" including, "'[a]t a minimum,'" declarations from Kreindler, Pounian, Maloney, and Benett. *Id.*

On August 16, 2021, Kreindler & Kreindler filed declarations from those four attorneys alone. SPA26. Those declarations were "substantially vaguer and less comprehensive" than those of the other PEC firms. *Id.* They did not address communications with Isikoff and gave "virtually no detail" about their firm's purported investigation. *Id.* Maloney, who later testified that he personally conducted the investigation, did not mention it in his own declaration, leaving that to Benett. *Id.*

**7.** On August 30, 2021, Judge Netburn found Kreindler & Kreindler's August 16 declarations "deficien[t]." SPA26 (citing JA919). She directed Kreindler, Pounian, Maloney, and Benett to disclose their communications with Isikoff and identify others who had access to the transcript, and specified that at

least one of their declarations should describe the firm's investigation and attach communications with Isikoff. SPA26-27 (citing JA919). She also required declarations from others with access to the transcript and a declaration from the head of Kreindler & Kreindler's IT group attesting that the firm had performed a "'forensic analysis'" to investigate the leak. SPA27 (quoting JA920).

On September 27, 2021, Kreindler & Kreindler submitted its supplemental declarations. *Id.* Benett was largely responsible for creating them, with help from Pounian. SPA28 (citing JA935, JA936; JA948; JA417-419 (Tr. 368:14-17, 369:25-370:2)). As set forth below, Judge Netburn found that each included "numerous misleading or false statements." *Id.*

**a.** Hartney's declaration, JA1070, "made several material misleading statements." SPA29. Everyone at Kreindler & Kreindler had access to the confidential deposition transcripts saved on Case Media, but Hartney stated that Case Media "'is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett.'" *Id.* (quoting JA1071, ¶ 5; citing JA187 (Tr. 138:18-25)). Benett wrote that language. When she sent him a draft of the declaration, Hartney had warned her that he "'d[id]n't think'" that statement was "'truthful,'" observing that the transcript "'was saved in the case media share . . . and everyone at Kreindler has access to everything in casemedia.'" *Id.* (quoting JA999). She replied that this "'language is drafted

carefully, and it does not say that it was restricted, in fact I was careful NOT to say that.'" *Id.* (quoting JA999). At the hearing, Hartney admitted that Benett "d[id]n't want to tell the court that everyone has access to everything." JA245 (Tr. 196:3-19); *see* JA191-192 (Tr. 142:8-143:13).[3]

**b.** Maloney, Benett, and Pounian each declared that no one with access to the transcript had failed to submit a declaration. SPA32-33. Judge Netburn found that was "false" because the entire Kreindler & Kreindler firm had access to the transcript through Case Media (as at least Maloney and Benett knew) but the vast majority of firm employees did not submit declarations. SPA33 (citing JA999; JA294-296 (Tr. 245:15-247:11)).

**c.** Like the other attorneys, Kreindler declared that he knew of no one with access to the transcript who had not submitted a declaration, without revealing that everyone at his firm had access. SPA33 (citing JA1065, ¶ 6). He "understate[d]" his interactions with Isikoff, omitting several text messages and a phone call, and violated the August 30 Order by failing to attach the messages. *Id.* (citing JA103-105 (Tr. 54:17-25, 55:2-56:12)). When asked, Kreindler testified

[3] Benett also included in Hartney's declaration, and Hartney signed, a statement that he "'did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed, by anyone else.'" SPA29 (quoting JA1071, ¶ 5). Judge Netburn found that statement misleading because it implies that Hartney looked for evidence of downloading or printing. It was "impossible" for Hartney to find such evidence because the firm's systems did not track those activities. *Id.* (citing JA194 (Tr. 145:14-22)).

that he did not check any records to prepare his declaration and relied only on memory. *Id.* (citing JA100-101 (Tr. 51:15-52:11, 52:23-25)). As Judge Netburn observed, he "did not explain why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders." *Id.*

**d.** No one asked Fawcett to prepare a declaration until September 23, 2021. SPA28 (citing JA503-504 (Tr. 454:9-455:20)). On the morning of September 27, he purportedly told Kreindler & Kreindler attorneys that he was responsible for the leak. SPA30 (citing JA437 (Tr. 388:19-25)). He wrote a draft declaration confessing to the breach and sent it to Benett and Pounian. *Id.* (citing JA505 (Tr. 456:7-15)). In that draft, Fawcett claimed that Kreindler & Kreindler had not known of his actions. He alleged that Al Jarrah's deposition transcript showed that Al Jarrah had "possess[ed] and view[ed] child pornography." JA988. He wrote that he sent Isikoff the transcript because "'the public must at least be forewarned'" about Al Jarrah's alleged conduct "'in order to have a chance to protect themselves.'" SPA30 (quoting JA988). He did not mention any personal motivation. *Id.* (citing JA397 (Tr. 348:21-25)). He also stated that he had "'sent a redacted version of the transcript'" to Isikoff, but did not deny that it contained MDL and FBI protected material. *Id.* (quoting JA988).

Benett and Pounian then edited the declaration. SPA31-32. Pounian added statements that "'the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography'" and that "Fawcett 'did not send any other portions of the deposition to Isikoff.'" SPA31 (quoting JA994) (alteration in original). As Judge Netburn found, those statements "give the impression that Fawcett sent only portions of the deposition transcript to Isikoff, when in fact, he sent the whole transcript"; although Fawcett later changed "'limited'" to "'focused on,'" the statement remained "misleading." SPA31-32.

Pounian added language stating that Fawcett "had a 'personal interest' in this issue because Al Jarrah worked in Morocco as a diplomat and Fawcett's children were from that country." SPA31. Benett edited this language to state that Fawcett knew from his "'background in global humanitarian work . . . that Morocco is a country with a history of child sex trafficking.'" *Id.* (quoting JA996) (ellipsis in original). Judge Netburn found those statements were "fabricated and intended to make Fawcett appear more sympathetic." SPA32; *see also* SPA46 (Fawcett's "personal motivation" was "primarily an invention of Pounian and Benett"). Although Benett testified that she did not "'write the words'" she added, Judge Netburn did not credit that testimony, finding "no evidence at the hearing

or in Fawcett's phone records that he participated in the[] additions." SPA31 (quoting JA395 (Tr. 346:20-22); citing JA1113-1114).[4]

As noted above, Fawcett made one other significant edit to his declaration. He deleted: "'Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff[] had obtained the transcript,'" and replaced it with: "'No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders.'" SPA31-32 (quoting JA1007). Judge Netburn found it significant that Fawcett was "unwilling" to swear that he had lied to his firm. SPA17, SPA44.

**e.** On September 30, 2021, Kreindler & Kreindler filed a second declaration from Fawcett with more details about his communications with Isikoff and the leak. SPA34. Contrary to the August 30 Order, neither of Fawcett's declarations attached copies of his communications with Isikoff. Kreindler & Kreindler did not produce those communications until Judge Netburn ordered

[4] In particular, Judge Netburn found that Pounian and Benett revised Fawcett's declaration between 12:20 p.m. and 1:47 p.m. on September 27, and that there were no calls between Fawcett on the one hand, and Pounian and Benett on the other, during this time. SPA31. She also observed that Fawcett had known about the decades-old allegations related to Al Jarrah for at least six months before the deposition, that his own children were at least 21, and that he never notified the U.S. or Moroccan governments about his concerns. SPA32 (citing JA517 (Tr. 468:8-24), JA519-520 (Tr. 470:5-471:16), JA538 (Tr. 489:11-14)).

further discovery and the firm retained outside counsel. *Id.* (citing JA226-229 (Tr. 177:21-178:6, 178:24-180:19)).

**8.** On October 4, 2021, Judge Netburn scheduled an evidentiary hearing and explained that she would "render findings of fact" about "the breach of the protective orders by Kreindler & Kreindler" and would "determine the appropriate remedies," which "may include . . . removal from the [PECs]." JA41. At no point before the hearing, or before Judge Netburn issued her sanctions order on September 21, 2022, did Kreindler & Kreindler suggest that she lacked authority to sanction the firm under Rule 37(b).

On November 1 and 2, 2021, Judge Netburn held the evidentiary hearing. SPA34-35. She admitted the declarations of Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett as direct testimony, counsel for Saudi Arabia cross-examined them, and counsel for Kreindler & Kreindler elicited redirect testimony. *Id.*

At the hearing, Kreindler & Kreindler's attorneys claimed they did not know of Fawcett's actions and defended the reasonableness of their investigation. They also attempted "to use the Court's investigation as a forum to compound the damage caused by the breach." SPA46. Most notably, Benett "went out of her way" to testify that Fawcett had "'strong feelings about somebody that he believed was not only trafficking in sexual images of minors but was deliberately living in a place where he would have easy access to minor children for sexual purposes.'"

SPA35 (quoting JA442 (Tr. 393:1-5)). That "additional gratuitous attack on Al Jarrah," Judge Netburn observed, had no support in the record. *Id.*[5]

**9.** A few months after the hearing, Kreindler & Kreindler again violated the MDL Protective Order by publishing on a website a set of documents produced by the United Kingdom's Metropolitan Police Service. SPA37-38. Under the MDL Protective Order, those documents should have been used only for the prosecution or defense of this case. SPA38 (citing JA688).

**10.** On September 21, 2022, Judge Netburn issued an Opinion & Order. Based on detailed factual findings, she concluded that "Kreindler & Kreindler, through Fawcett and Kreindler, breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff." SPA40. She invoked Rule 37(b)(2) to issue a "'just'" order that "'relate[d] to the particular claim to which the discovery order was addressed.'" SPA49 (quoting *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991), in turn quoting Fed. R. Civ. P. 37(b)(2)(A)). She found that the appropriate sanctions were to remove "Kreindler & Kreindler . . . from the PECs effective immediately," to reduce the firm's ability to share in any future common fund,

[5] Benett's testimony at the hearing and later discovery also revealed that Kreindler & Kreindler had improperly permitted a consultant to attend the Al Jarrah deposition, did not notice his appearance on the record, and failed to obtain his written consent to abide by the MDL Protective Order. SPA36-37 (citing JA377-379 (Tr. 328:6-330:1); JA692-693).

and to order it "to pay attorneys' fees and costs sought by Saudi Arabia in connection with the breach." SPA6, SPA49-50.

Judge Netburn concluded that Kreindler & Kreindler's violation was "willful" and "the result of deliberate coordination between Fawcett and Kreindler," while "the rest of the firm was, at best, willfully blind to this strategy." *Id.* She considered lesser remedies, such as "admonishment," "financial penalties," and "[p]rohibiting the use of the Al Jarrah Transcript," but found they had been or would be ineffective. SPA51-53. She balanced any harm to Kreindler & Kreindler's clients against the need to address "the firm's repeated flouting of the Protective Orders and lack of candor before the Court." SPA53-54. She considered the "effectively permanent" effects of the breach, SPA54; the "warn[ings]" previously given, SPA55-56; and the firm's "complete lack of respect for the Court and its orders," as shown by "the sheer number of misrepresentations the firm made during the Court's investigation" and its "increasing rate" of "violations of the Protective Orders," SPA56-58. In sum, she explained that she had "lost faith in [Kreindler & Kreindler's] ability to comply with court orders or appear before the Court on behalf of all the September 11 victims." SPA6, SPA59.

**11.** On July 17, 2023, Judge Daniels overruled Kreindler & Kreindler's objections to Judge Netburn's order. He concluded that the "sanctions against

Kreindler & Kreindler, including the immediate removal of the firms' attorneys from the PECs, were authorized as a matter of law and fully commensurate with the firm's misconduct." SPA86. He agreed with Judge Netburn's findings that "James Kreindler, if not additional Kreindler & Kreindler attorneys, was directly involved in John Fawcett's leak of the Al Jarrah transcript," *id.* (emphasis and capitalization omitted); that the firm's subsequent investigation was "grossly deficient" and "buried the truth," SPA88 (emphasis and capitalization omitted); and that members of the firm "either (a) wanted to remain 'willfully unaware' of what a proper investigation would reveal or (b) w[ere] already aware and 'actively colluded in a cover-up," SPA90 (cleaned up); that "several senior Kreindler & Kreindler attorneys 'obstructed the [Court's] investigation' and made 'knowingly misleading statements to the Court,'" SPA91 (brackets in original); and that the firm's "willful violations of the Protective Orders significantly harmed th[e] multidistrict litigation," SPA94. This conduct led the court to the "inevitable conclusion that Kreindler & Kreindler is no longer a responsible steward to advocate on behalf of all 9/11 [Plaintiffs]." SPA97.

**12.** On February 10, 2023**,** while its objections to Judge Netburn's ruling were still pending, Kreindler & Kreindler sought mandamus relief. It argued that mandamus was the only relief available because the sanctions order was not an "immediately appealable collateral order." No. 23-178, Dkt. No. 5, at 31.

After Judge Daniels overruled the firm's objections, it asserted that "[m]andamus is now the *only* guaranteed means" of review because "[n]either certification of an interlocutory appeal *nor a collateral order appeal* is available here." *Id.*, Dkt. No. 43, at 10 (emphases added). It "protectively" filed this appeal "in the event [this Court] concludes that mandamus is unavailable because the Sanctions Orders are reviewable under the collateral order doctrine." ECF No. 1-1, at 1. In doing so, it continued to insist that "mandamus is proper because, *inter alia*, appellate review by direct appeal is not available at this time." *Id.*

On November 21, 2023, this Court denied the mandamus petition. No. 23-178, Dkt. No. 74. Nothing in its order suggested that the district court's order was immediately reviewable. Kreindler & Kreindler has since moved forward with the present appeal. The parties engaged in letter-briefing before a motions panel as to whether this Court has appellate jurisdiction. *See* Dkts. 31, 44, 48. The Court referred the jurisdictional issue to a merits panel and further directed the parties to brief whether the Court may assume hypothetical jurisdiction. JA1189-1190.

## STANDARD OF REVIEW

This Court assesses "all aspects of a District Court's decision to impose sanctions for abuse of discretion," including a "*de novo* review of any rulings of law" and a review of "factual findings . . . for clear error." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 143, 145 (2d Cir. 2010). Factual findings are clearly erroneous only where the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168 (2d Cir. 2001). "[W]here, as here, findings are based on credibility determinations, even greater deference is required, 'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

## SUMMARY OF ARGUMENT

**I.** This Court lacks appellate jurisdiction under 28 U.S.C. § 1291 because the district court's order is not final and the collateral-order doctrine does not apply. Under *Cunningham v. Hamilton County*, 527 U.S. 198 (1999), orders sanctioning attorneys under Rule 37 cannot be immediately appealed. In *New Pacific Overseas Group (U.S.A.) Inc. v. Excal International Development Corp.*, 252 F.3d 667 (2d Cir. 2001) (per curiam), this Circuit applied *Cunningham* to attorney sanctions under Rule 37(b). Kreindler & Kreindler's attempts to distinguish those cases fall short. Alternatively, because the jurisdictional defect is statutory, not constitutional, the Court may affirm under the doctrine of hypothetical jurisdiction.

**II.** The district court properly sanctioned Kreindler & Kreindler under Rule 37(b). That Rule gives a court broad authority to "issue . . . just orders" when a "party" violates a discovery order. In litigation, parties act through counsel. When counsel violates a discovery order while representing a party, a district court may issue a "just order[]" in response – including a sanction directed at counsel, rather than the party, if justice so requires. District courts in this Circuit have often issued such orders, and this Court has affirmed them in cases including *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997) (per curiam). Alternatively, the Court may affirm the district court's removal of Kreindler & Kreindler from the PECs as an exercise of inherent authority.

**III.** The district court did not clearly err in finding that Fawcett acted with Kreindler's knowledge or at least tacit approval in sending the Al Jarrah transcript to Isikoff. Nor can Kreindler & Kreindler overcome the court's credibility determinations that Kreindler, Maloney, Benett, Pounian, and Fawcett signed false and misleading declarations and then gave untruthful testimony on the stand.

## ARGUMENT

### I. This Court Lacks Appellate Jurisdiction

Under 28 U.S.C. § 1291, courts of appeals review "final decisions of the district courts." Typically, such decisions "end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521-22 (1988). A "small category" of other "collateral order[s]" are also "final." *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 204-05 (1999). That "small category includes only decisions" that (1) "are conclusive"; (2) "resolve important questions separate from the merits"; and (3) "are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* at 202, 204 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). This appeal does not qualify.

#### A. Rule 37 Attorney-Sanctions Orders Are Not Immediately Appealable

*Cunningham* held that Rule 37 attorney-sanctions orders are not "final decisions" under § 1291. That case involved an attorney who sought interlocutory

appeal of a Rule 37 order that "disqualif[ied]" her "as counsel for plaintiff." 527 U.S. at 201. The Supreme Court explained that "a sanctions order imposed on an attorney" under Rule 37 "is not a 'final decision'" because it "neither ended the litigation nor left the court only to execute its judgment." *Id.* at 204, 209-10. Nor is such an order "final" under the collateral-order doctrine. Rule 37 sanctions orders do not stand "separate from the merits." *Id.* at 205. Often, such orders are "inextricably intertwined with the merits of the action," because "[a]n evaluation of the appropriateness of sanctions may require the reviewing court to inquire into the importance of the information sought or the adequacy or truthfulness of a response." *Id.* at 205-06. Although "not every discovery sanction will be inextricably intertwined with the merits," the Supreme Court has "eschewed a case-by-case approach to deciding whether an order is sufficiently collateral," in favor of categorical rules. *Id.* at 206. In addition, "[e]ven if the merits were completely divorced from the sanctions issue," Rule 37 orders are not "effectively unreviewable" after final judgment. *Id.*; *see id.* at 206-07 ("[T]he identity of interests between the attorney and client . . . counsels against treating attorneys like other nonparties for purposes of appeal.").

*Cunningham*'s analysis applies to all attorney-sanctions orders under Rule 37, not just to some. To be sure, *Cunningham* addressed a sanction under Rule 37(a); this appeal involves one under Rule 37(b). But nothing in *Cunningham*'s

reasoning is specific to Rule 37(a), and this Court has applied it to Rule 37(b) sanctions. *See New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp.*, 252 F.3d 667 (2d Cir. 2001) (per curiam) (finding no jurisdiction to review the lower court's Rule 37(b) attorney-sanctions order, *see* 2000 WL 377513, at *6-10 (S.D.N.Y. Apr. 12, 2000)); *id.* at 670 ("an order imposing Rule 37 sanctions against an attorney, either alone or jointly and severally with his client, is not an appealable 'final decision'"). The same is true for Rule 37(b) orders sanctioning parties, *see Linde v. Arab Bank, PLC*, 706 F.3d 92, 105 (2d Cir. 2013), and for "inherent power[]" sanctions, *SEC v. Smith*, 710 F.3d 87, 96 (2d Cir. 2013).

### B. Orders Limiting the Role of Counsel in a Consolidated Action Are Not Immediately Appealable

Kreindler & Kreindler erroneously argues (at 39-40) that "[o]rders limiting the role of counsel in a consolidated action" can be immediately appealed. That argument is foreclosed by *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). *Richardson-Merrell* addressed an attempt to appeal a disqualification order against attorneys who (like Kreindler & Kreindler) improperly "release[d] . . . information to" the press, and then "prepar[ed] and obtain[ed] a statement . . . without regard for [its] truth" "to protect [the] firm's financial interest and to thwart an investigation." *Id*. at 428 (internal quotation marks omitted). *Richardson-Merrell* held that "orders disqualifying counsel in a civil case are not collateral orders subject to immediate appeal." *Id*. at 426. It foreshadowed *Cunningham*'s reasoning: "the propriety of

the trial court's disqualification order can be reviewed as effectively on appeal of a final judgment as on an interlocutory appeal," *id.* at 438; and "orders disqualifying counsel in civil cases, as a class, are not sufficiently separable from the merits to qualify for interlocutory appeal," *id.* at 440.

Applying *Richardson-Merrell*, this Court has held that "a ruling denying appointment of a shareholders' committee in a bankruptcy proceeding" cannot be immediately appealed because it is not "effectively unreviewable on appeal from a final judgment." *In re Johns-Manville Corp.*, 824 F.2d 176, 181 n.2 (2d Cir. 1987). This Court has also held that it lacks jurisdiction over an interlocutory appeal from a denial of a motion to substitute counsel. *See In re ALBA Petróleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105, 108, 112 (2d Cir. 2023) (describing *Richardson-Merrell* as holding that an "appeal of a final judgment" suffices when "a district court *actually* disqualifies a party's counsel in a civil case"). Here, the district court's order removes Kreindler & Kreindler from the PECs. It does not restrict the firm's ability to represent its own clients. The firm still represents the *Ashton* Plaintiffs, files motions on their behalf, and recently argued against a motion to dismiss. Dist. Ct. ECF No. 10287. Kreindler & Kreindler's arguments for immediate appeal are far weaker than the unsuccessful ones in *Richardson-Merrell*, *Johns-Manville*, and *ALBA Petróleos*.

Kreindler & Kreindler's argument rests on a single sentence from a footnote in *Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (2d Cir. 1971) (per curiam). That sentence states, without reasoning, that the Court had "jurisdiction over" an appeal "under the 'collateral order' doctrine." *Id.* at 459 n.1. *Farber* is distinguishable. It involved "an appeal by two plaintiffs" of district-court orders that required motions to be served by lead counsel, required court permission before other counsel could file motions, and barred a firm that was not lead counsel and that had not sought permission from moving for summary judgment. *Id.* at 458-59. The district court has imposed no such restrictions here.

In any event, *Farber* predated *Richardson-Merrell* and *Cunningham*, which displaced contrary Circuit precedent. *New Pacific* recognized that "*Cunningham* effectively overrule[d] this Circuit's law" in some earlier cases. 252 F.3d at 670. A footnoted, unreasoned sentence in an easily distinguishable case cannot stand against the holdings and reasoning of two later Supreme Court decisions.

### C. Orders Sanctioning Attorneys for Protective-Order Violations Are Not Immediately Appealable

Kreindler & Kreindler argues (at 41-46) that sanctions for an attorney's breach of the court's protective orders are not subject to the bright-line rule announced in *Cunningham*. But no distinction separates Rule 37 sanctions against attorneys for protective-order violations from Rule 37 sanctions against attorneys for other violations.

*First*, Kreindler & Kreindler argues (at 42) that *Cunningham* does not apply because "the district court[ ] . . . created a category of Rule 37(b) orders that . . . do not arise from any act or authorization of a party to the litigation." But the Rule 37(b) sanctions here do arise from an act attributable to a party: Kreindler & Kreindler had access to the Al Jarrah deposition as a representative of its clients, and its violation of that protective order as part of its press strategy was a (misguided and wrongful) act on behalf of its clients. *Infra* pp. 38-42.

*Second*, Kreindler & Kreindler errs in contending (at 42-43) that protective-order violations by attorneys, as a class, "involve . . . issue[s] separate from the merits of the action." To be sure, whether an attorney has violated a protective order may itself stand apart from the merits. But that cannot be said of the question of what sanction should be imposed. Sanctions often bear directly on the underlying dispute – for instance, a bar on future use of a leaked document. Although the district court did not apply that remedy here, Judge Netburn considered it, SPA52-53, and courts have done so in other cases.[6] Further, the

---

[6] *See, e.g.*, *City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730, at *7 (S.D.N.Y. Mar. 5, 2018) (as a sanction, "prohibit[ing]" a party "from using" a leaked "[t]ranscript in this action or any other action"); *Koch v. Greenberg*, 2011 WL 4485975, at *4 (Sept. 28, 2011) (adopting recommendation to "preclude[ ]" a party "from introducing [leaked documents] on any substantive motion in this case or at trial"), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012) (adopting recommendation to lift sanction on basis of new evidence); *see also Palomo v. DeMaio*, 2018 WL 10323057, at *4-6 (N.D.N.Y. May 16, 2018) (adopting recommendation to preclude testimony by expert who violated protective order).

remedy that the district court did apply – removal from the PECs – required consideration of the effect of removal on the 9/11 MDL. For example, Kreindler & Kreindler argued to the district court that "any sanction limiting [its] role would severely harm [its] clients' case and disrupt the litigation." Dist. Ct. ECF No. 7615, at 52. Judge Netburn considered that argument, SPA53-54, though it did not persuade her. As *Richardson-Merrell* explains, an assessment of whether a district court's ruling causes "prejudice[ ]" to a party is "inextricably tied up in the merits." 472 U.S. at 439.

*Third*, contrary to Kreindler & Kreindler's assertions (at 43), protective-order sanctions against attorneys are not effectively unreviewable after final judgment. Kreindler & Kreindler contends (at 44-45) that "nonparties generally have no right of appeal from a final judgment" and that immediate appeal is important to protect "the due process rights of nonparties." But *Cunningham* reasons that attorneys should not be "treate[d] . . . like other nonparties for purposes of appeal" because they have an "identity of interests" with their client and "assume an ethical obligation to serve their clients' interests." 527 U.S. at 206-07; *see id.* ("'[A]n attorney who is disqualified for misconduct may well have a personal interest in pursuing an immediate appeal, an interest which need not coincide with the interests of the client. As a matter of professional ethics,

however, the decision to appeal should turn entirely on the client's interest.'") (quoting *Richardson-Merrell*, 472 U.S. at 435).

*Fourth*, Kreindler & Kreindler misplaces reliance (at 45) on the rule that contempt findings are immediately appealable. Again, that argument was rejected in *Cunningham*, which emphasized "the significant differences between a finding of contempt" and a "sanctions order" under Rule 37. *Cunningham*, 527 U.S. at 207. In particular, *Cunningham* emphasized the role of sanctions in "protect[ing] courts and opposing parties from delaying and harassing tactics" and the concerns that "[i]mmediate appeals of such orders would undermine trial judges' discretion to structure a sanction in the most effective matter" and would lead judges "not to sanction an attorney, despite abusive conduct, in order to avoid further delays." *Id.* at 208-09. As both Judge Netburn and Judge Daniels remarked, those concerns have force here.[7] Even Kreindler & Kreindler's former PEC colleagues agreed that it would "not [be] 'productive to engage in any further distractions created by the Kreindler firm.'" SPA98.

[7] SPA54 ("It took months to overcome Kreindler & Kreindler's obstruction. It will doubtless take months more to address objections. Another draining debacle is out of the question."); SPA98 ("This Court will no longer entertain the distractions presented by Kreindler & Kreindler's misconduct and its resistance to the consequences of its own actions.").

### D. This Court May Exercise Hypothetical Jurisdiction, but Only To Affirm the Sanctions Order

Generally, a court must determine its jurisdiction before deciding a case on the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998). Many circuits, including this one, hold that "where a question of statutory (non-Article III) jurisdiction is complex and [a] claim fails on other more obvious grounds, this Court can assume hypothetical jurisdiction in order to dismiss on those obvious grounds." *Miller v. Metropolitan Life Ins. Co.*, 979 F.3d 118, 123 & n.4 (2d Cir. 2020) (collecting cases). Such "hypothetical statutory jurisdiction" is "particularly appropriate . . . where the jurisdictional issue is both novel and arguably complex" and the claims over which jurisdiction is doubtful "are plainly meritless." *Butcher v. Wendt*, 975 F.3d 236, 244 (2d Cir. 2020). The final-judgment requirement for appellate jurisdiction is statutory, not constitutional, because it stems from 28 U.S.C. § 1291. Accordingly, if this Court finds Kreindler & Kreindler's arguments plainly meritless (which they are), it may reject them and affirm without deciding whether it has appellate jurisdiction.

Kreindler & Kreindler appears to assert (at 47-48) that this Court should assume hypothetical jurisdiction and then reverse. But the premise of hypothetical jurisdiction is that "the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Steel Co.*, 523 U.S. at 93; *see also Butcher*, 975 F.3d at 248 (Menashi, J., concurring in part and concurring in the

judgment); David G. Knibb, *Federal Court of Appeals Manual* § 2:1 (7th ed. 2024) (explaining that courts exercise hypothetical jurisdiction only "where there is no practical difference in the outcome"). Here, the prevailing party if the Court lacks jurisdiction would be Saudi Arabia, so the exercise of hypothetical jurisdiction would be appropriate only to affirm. To reverse, this Court would need actual (not hypothetical) appellate jurisdiction (which, as explained above, it does not have).[8]

## II. The District Court's Sanctions Were Authorized by Law

### A. The District Court Had Authority Under Rule 37(b)(2)(A) To Sanction Kreindler & Kreindler

**1.** Rule 37(b)(2)(A) authorizes sanctions "For Not Obeying a Discovery Order" and states: "If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders." The Rule then lists examples that just orders "may include," but does not limit the court to those examples.

Accordingly, a sanctions order requires a finding that "a party or a party's officer, director, or managing agent," or a dedicated witness, failed to obey an

[8] *Springfield Hospital, Inc. v. Guzman*, 28 F.4th 403 (2d Cir. 2022), which Kreindler & Kreindler cites (at 47) is not to the contrary. The difficult jurisdictional question in *Springfield Hospital* was a question of federal sovereign immunity that went to district-court subject-matter jurisdiction, not to appellate jurisdiction. *See* 28 F.4th at 415-17. *Springfield Hospital* could accordingly assume that the district court had jurisdiction and then vacate the district court's order on merits grounds; the arguably immune defendant prevailed either way.

order of the court. After finding such a failure, a district court can issue any "just order[ ]" as an appropriate sanction. Rule 37(b)(2)(A) requires only that the orders be "just" – it neither says nor implies that they may be directed only against the party whose failure to obey triggered sanctions. *See Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 487, 490-91 (5th Cir. 2012) (upholding Rule 37(b)(2) sanctions against both an attorney and that attorney's law firm for violating a protective order, and reasoning that courts are "authorized [under Rule 37(b)] to impose sanctions against parties or counsel"); *see generally Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam) ("A district court has broad power to impose Rule 37(b) sanctions in response to abusive litigation practices.").

Where, as here, an attorney violates a discovery order, that violation is attributed to the "party" the attorney represents, triggering sanctions under Rule 37(b). *See American Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670, at *5 (2d Cir. Apr. 6, 2000) (judgment noted at 210 F.3d 354 (table)) ("in reference to Rule 37(b) sanctions, '[a] litigant chooses counsel at his peril' ") (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)) (brackets in *American Cash*).[9] That is consistent with the

[9] *See also Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657, at *3, *5 (S.D.N.Y. June 6, 2017) (following *SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998), and imputing attorney's violation of discovery order to a party under

well-settled principle that "the conduct of an attorney is imputed to his client" and a "'party is deemed bound by the acts of his lawyer-agent.'" *McNulty*, 137 F.3d at 739 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962)). Kreindler & Kreindler concedes (at 29-30) that principle, acknowledging that a "party" under Rule 37(b) includes not only "one by or against whom a lawsuit is brought," but also "an attorney acting on the party's authorization."[10]

Judge Netburn found that "Fawcett leaked the transcript" of the Al Jarrah deposition in violation of the district court's protective orders "as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler." SPA6. Kreindler & Kreindler attorneys' willful violations of the court's protective orders and obstruction of the court's investigation to advance Plaintiffs' litigation strategy are attributable to the parties they represent: the *Ashton* Plaintiffs. The court therefore had discretionary authority to issue "just orders" under Rule 37(b). It then could, and properly did,

---

Rule 37(b)); *Copeland v. Rosen*, 194 F.R.D. 127, 133 (S.D.N.Y. 2000) (same), *remanded on other grounds*, 25 F. App'x 17 (2d Cir. 2001).

[10] Kreindler & Kreindler points (at 30-31) to other provisions in Rule 37 that refer both to a "party" and the attorney representing the party, to suggest that the drafters of Rule 37(b) did not intend the term "party" to encompass the party's attorney. This cannot be squared with its own concession that a "party" under Rule 37(b) includes the party's attorney when "acting on the party's authorization."

exercise discretion to put the brunt of its sanctions on Kreindler & Kreindler rather than on the *Ashton* Plaintiffs themselves.[11]

The protective orders confirm that counsel gains access to confidential material, and must protect that material, on behalf of a party. The MDL Protective Order governs the use and disclosure of confidential information by any "Party," which it defines to "mean any party to this MDL, including all of its officers, directors, employees, consultants, retained experts, and *outside counsel (and their support staff)*." JA686 (¶ II.B.1) (emphasis added). And it defines the confidentiality obligations of a "Receiving Party," *see* JA687 (¶ II.B.4); JA691-693 (¶ II.H.1-5), which Kreindler & Kreindler has repeatedly violated.

Similarly, the Privacy Act Order and Protective Order for FBI Documents ("FBI Protective Order") governs the use of documents by "Qualified Persons." The term "Qualified Persons" includes "Members of the Plaintiffs' Executive Committees ('PECs'), and any support staff of such PEC members . . . , as well as attorneys who are members of the same law firm as a member of the PEC." JA729 (¶ 6(i)). The FBI Protective Order further describes various actions that a "party" may or must take, such as challenging designations, *id.* (¶ 4); seeking consent to

---

[11] Kreindler & Kreindler errs in asserting (at 33) that the district court "did not conclude that [Kreindler & Kreindler] qualified as a 'party' under Rule 37." *See* SPA40 n.14 ("While the language of Rule 37(b) refers to a 'party's' failure to obey an order, this includes misconduct by the party's attorney.").

share protected information, JA730 (¶ 7); filing under seal, JA732 (¶ 11); and using protected information in court, JA733 (¶ 13). All those actions can be taken only by the Qualified Persons representing a party rather than by the party personally, because only the Qualified Persons have access to the protected information.

Kreindler & Kreindler mischaracterizes (at 30, 35) *Maples v. Thomas*, 565 U.S. 266 (2012), to suggest that its leak of the Al Jarrah transcript should not be imputed to its clients. *Maples* affirmed the general rule that attorney misconduct is attributed to the client. *See id.* at 280-81 ("[T]he attorney is the [party's] agent, and under well-settled principles of agency law, the principal bears the risk of negligent conduct on the part of his agent.") (cleaned up). It then recognized a narrow exception when the attorney "abandon[s]" the client, such as through "near-total failure to communicate with [the client] or to respond to . . . many inquiries and requests over a period of several years." *Id.* at 282-83.[12] Kreindler & Kreindler never abandoned its clients. To the contrary, the record supports the district court's finding that Kreindler & Kreindler's deliberate leak was part of the firm's long-standing media strategy to obtain a settlement for its clients, SPA6 – a strategy that has also included other protective-order breaches involving another

[12] Kreindler & Kreindler's assertion (at 35) that "*McNulty* no longer appears to be good law" after *Maples* ignores the discussion in *Maples* of what it means for an attorney to "abandon" its client.

leak of confidential information, SPA37-38, SPA73, and publication of discovery material on a website, SPA56-57, SPA95.

**2.** Consistent with the language and structure of Rule 37(b), courts have imposed "just order" sanctions on both individual attorneys and law firms who violate discovery orders. *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997) (per curiam), affirmed Rule 37(b) sanctions against a party's attorney for the attorney's role in a witness's failure to appear for deposition, explaining that the conduct "justifie[d] the district court's imposition of sanctions for his contempt of court under Rule 37(b)." *Id.* at 103. Kreindler & Kreindler fails to distinguish *Fonar* by asserting (at 34-35) that the sanctions there were based on the witness's disobedience. *Fonar* makes clear that the Rule 37(b) sanction it upheld stemmed from "*counsel's* failure to obey discovery orders." 128 F.3d at 101 (emphasis added).

*Fonar* is far from the only example of a court directing a "just order" sanction to an attorney – or a law firm – as a remedy for a discovery order violation. *See Mahboob v. Educational Credit Mgmt. Corp.*, 2021 WL 7448532, at *4 (S.D. Cal. Mar. 31, 2021) (directing counsel to disclose names of improperly contacted individuals as Rule 37 sanction for protective-order violation); *Smith v. Bradley Pizza, Inc.*, 2019 WL 430851, at *1, *3 (Feb. 4, 2019) (relying on Rule 37(b)(2)(A) to direct "defense counsel" to pay non-contempt monetary sanction), *objections*

*overruled*, 2019 WL 2448575 (D. Minn. June 12, 2019), *aff'd*, 821 F. App'x 656 (8th Cir. 2020) (per curiam); *O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101, at *4, *9 (N.D. Cal. Aug. 31, 2017) (relying on Rule 37(b)(2)(A), among other authorities, to direct class counsel to issue corrective notice after violating protective order); *In re Steward*, 529 B.R. 903, 913, 918 (E.D. Mo. 2015) (affirming imposition of monetary sanction on attorney under Rule 37(b)(2)(A), in addition to fee award), *aff'd*, 828 F.3d 672 (8th Cir. 2016).[13]

**3.** Kreindler & Kreindler's arguments confuse the difference between Rule 37(b)'s predicate for a sanctions order (a violation by a "party") and the "just orders" that a district court may issue after finding that predicate (including sanctions against an attorney or law firm through which the party violated the order). That confusion is shown by Kreindler & Kreindler's attempts to compare Rule 37(b) to differently worded rules. Each of those rules, unlike Rule 37(b), has specific language restricting a district court's remedial authority.

*First*, Kreindler & Kreindler errs in comparing (at 31) Rule 37(b) to Rule 11(c), which states that, if "the court determines that Rule 11(b) has been violated,

[13] Although *Mahboob*, *Smith*, and *O'Connor* refer to the targets of sanctions using terms such as "Plaintiffs' counsel," "defense counsel," and "class counsel," context indicates that firms, not attorneys, were sanctioned. *See Mahboob*, 2021 WL 7448532, at *4 (referring to "Plaintiff's counsel" in the plural); *Smith*, 2019 WL 430851, at *1 (granting a sanctions motion against "Best & Flanagan LLP"); *O'Connor*, 2017 WL 3782101, at *5-6 (referring to "Class Counsel" as "it").

the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation" – that is, Rule 11(c) lists specific entities "on" whom "the court may impose an appropriate sanction." The "just orders" provision of Rule 37(b) does not similarly limit the entities that may be the subject of a "just order[ ]."

*Second*, Kreindler errs in comparing (at 31) Rule 37(b) to Rule 37(f), which states that, "[i]f a party or its attorney fails to participate in good faith in developing and submitting a proposed discovery plan . . . , the court may . . . require that party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the failure." Like Rule 11(c), Rule 37(f) lists specific entities on whom the court may impose sanctions. Again, no such limitation exists in the "just orders" provision of Rule 37(b).

*Third*, Kreindler & Kreindler errs in comparing (at 32-33) Rule 37(b) to former Rule 37(c), which this Court construed in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988). Under former Rule 37(c), where " 'a party fail[ed] to admit the genuineness of any document or the truth of any matter,' " the relief of " 'an order *requiring [that] party* to pay' " reasonable expenses and fees. *Id.* at 1013-14 (quoting Fed. R. Civ. P. 37(c) (1987)) (emphasis in *Apex Oil*). Thus, like Rules 11(c) and 37(f), but unlike Rule 37(b), former Rule 37(c) did not

authorize "just orders" generally, but specifically authorized for a fee order against the "party" that improperly failed to admit.[14]

*Fourth*, Kreindler & Kreindler errs in comparing (at 31) Rule 37(b) to Rule 37(d), construed in *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022). Rule 37(d) authorizes sanctions where a "party" or a "person designated" under certain rules "fails . . . to appear for [a] deposition" or to properly answer or object to "interrogatories" or a "request for inspection." Fed. R. Civ. P. 37(d)(1)(A). The resulting sanctions "may include any of the orders *listed in* Rule 37(b)(2)(A)(i)-(vi)" and also "must," with certain exceptions, include an order "requir[ing] the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(d)(3) (emphasis added). That is, Rule 37(d)(3) neither contains its own general authorization for "just orders" nor incorporates the "just orders" authorization from Rule 37(b). Accordingly, the Sixth Circuit's reasoning that Rule 37(d)(3) "confines liability" to a set of targets that do not include law firms, *NPF Franchising*, 37 F.4th at 383, does not apply here.

---

[14] The other cases cited by Kreindler & Kreindler (at 34) – *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1226-27 & n.7 (10th Cir. 2015); and *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 141 (3d Cir. 2009) – also construed Rule 37(c).

### B. The District Court Had Inherent Power To Remove Kreindler & Kreindler from the PECs

The district court alternatively concluded that it had and would, if necessary, exercise authority to remove Kreindler & Kreindler from the PECs under its inherent powers. SPA96 (citing, *e.g.*, *In re Asbestos Litig.*, 963 F. Supp. 247, 251 (S.D.N.Y. 1997); *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006)); *see* 28 U.S.C. § 1407(b) (authorizing the judge to whom an MDL is assigned to "conduct[ ]" "coordinated or consolidated pretrial proceedings" and to "exercise the powers of a district judge in any district" when doing so). Removal was appropriate because the court had "lost faith in Kreindler & Kreindler's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs." SPA96-97 (cleaned up).

Kreindler & Kreindler fails to address the district court's power to modify its prior pre-trial order appointing the firm's attorneys as representatives of all personal-injury plaintiffs. Instead, citing *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020), it asserts (at 37) that sanctions under a court's inherent authority must be supported by clear and convincing evidence. That assertion fails for two reasons.

*First*, modification of the court's previous order appointing committee members is not a sanction. It is an exercise of "the district court's broad discretion to direct and manage the pre-trial discovery process." *Wills v. Amerada Hess*

*Corp.*, 379 F.3d 32, 41 (2d Cir. 2004) (Sotomayor, J.); *see*, *e.g.*, *In re General Motors LLC Ignition Switch Litig.*, 2016 WL 1441804, at *13 (S.D.N.Y. Apr. 12, 2016) (removing attorney from executive committee, explaining that the removal "is *not* a sanction for filing [unsupported] motions" but "based on [the attorney's] own admitted failure to fulfil the basic duties and responsibilities of his position").

*Second*, although Judge Daniels' order largely tracked Judge Netburn's reasoning under Rule 37(b), he also made a supplemental finding of "clear and convincing evidence that Kreindler & Kreindler lacked any basis to represent to the court in July and August 2021 that it had completed a thorough investigation, or that it could confidently conclude it was not involved in the leak." SPA90; *see* Fed. R. Civ. P. 72(a) (authorizing district court to "modify" magistrate judge's order on review). Accordingly, even if clear and convincing evidence were required, Judge Daniels still had a basis to impose sanctions.

## III. The Record Supports the District Court's Factual Findings

There is no error (much less clear error) in Judge Netburn's careful review of the evidence or in Judge Daniels' rejection of Kreindler & Kreindler's objections to her order. Indeed, she determined not only that Kreindler, Maloney, Benett, Pounian, and Fawcett signed false and misleading declarations, *see* SPA28-33,

but also that they testified untruthfully in her courtroom.[15] Such face-to-face credibility determinations receive "even greater deference," *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004), than do other findings of fact.

### A. Kreindler Knew of or at Least Tacitly Consented to Fawcett's Actions

**1.** Judge Netburn reasonably determined that Fawcett acted with Kreindler's "knowledge or at least tacit consent" and "t[ook] his direction from Kreindler [in] leak[ing] confidential material." SPA6, SPA48. Although Fawcett's September 27, 2021 declaration stated that, "[u]ntil today, no one other than Michael Isikoff and I knew that I sent the redacted transcript to Michael Isikoff" and that "[n]o one from Kreindler [& Kreindler] directed me to send the transcript to Michael Isikoff," JA1097, ¶ 3, Judge Netburn was not required to credit those statements. Nor was she required to credit Kreindler's denials that he knew Fawcett had leaked the transcript. *E.g.*, JA171 (Tr. 122:1-6). Her contrary findings were supported by her observation of the witnesses and by four categories of evidence.

[15] *See*, *e.g.*, SPA13 ("The Court does not find this testimony [from Kreindler] credible."); SPA17 ("The Court credits Fawcett's testimony over the testimony of Pounian and Maloney."); SPA21-23, SPA42-43 (finding Kreindler's and Fawcett's "explanations" for their phone calls "not credible"); SPA31 (rejecting Benett's testimony that she "'formatted'" Fawcett's declaration but "did not 'write the words'"); SPA43 ("Fawcett's explanation for what triggered these communications to Crotty is also suspect.").

**a.** Kreindler had an "amply demonstrated . . . motive for the leak." SPA41. That motive was his "litigation strategy" of "us[ing] press attention to force Saudi Arabia into a settlement," with an expectation of a "substantial benefit" – based on a "likely" award of "billions of dollars" – if that strategy succeeds. SPA41, SPA52. Kreindler's "vitriolic" attacks on the court's orders further show his heavy reliance on, and personal attachment to, his press-centered strategy. SPA41. Fawcett also had a motive to leak the transcript in coordination with Kreindler, even though it put him at personal risk, because of the "extreme reciprocal loyalty" he shared with Kreindler. SPA13, SPA47. By contrast, Judge Netburn reasonably rejected Kreindler & Kreindler's depiction of Fawcett as "a man with such a blinding hatred for child pornography that he would betray his long-time employer and friends by disclosing confidential material they had a duty to protect." SPA47.

Kreindler & Kreindler describes (at 55) as "facially implausible" the idea that it might use media attention to attempt to pressure Saudi Arabia to settle. But Kreindler conceded on the stand that he has made "public statements about this case for years to put settlement pressure on the defendants." JA73 (Tr. 24:3-5); *see also* JA74 (Tr. 25:3-5) ("I would say to put pressure on the defendant Saudi Arabia, yes. The form of a resolution may or may not be what we traditionally think of as a

settlement."). It was not clear error for the district court to accept Kreindler's own description of his litigation strategy.

**b.** Kreindler and Fawcett had an established method of "coordinated efforts" in contacting reporters, with Kreindler or another attorney "lay[ing] the groundwork" and Fawcett "follow[ing] up with supporting documents." SPA41. This "tag-team" approach "resulted in the 2017 breach," SPA41-42, and the hearing record contained other examples, *see* JA90 (Tr. 41:12-18), JA91-93 (Tr. 42:17-44:9) (Kreindler discussing Fawcett's contacts with reporters including Laura Sullivan of NPR News); JA257-258 (Tr. 208:11-209:5) (Maloney stating that "from time to time [Fawcett] was asked to provide a nonconfidential document" for a reporter and agreeing that "[b]efore" doing so Fawcett would "seek[ ] the approval of the attorneys at the firm"). That past practice was probative evidence that Fawcett also had attorney approval to leak to Isikoff.

**c.** Kreindler's and Fawcett's phone calls with Isikoff and with one another on June 28 were "suspicious," as were their calls with one another on July 22, interspersed with Fawcett's contacts with Crotty. SPA42-43. Judge Netburn reasonably rejected their explanations for those calls as not "credible" and "suspect." *Id.*[16] Her reasoning was not merely that the calls were close together.

---

[16] Contrary to Kreindler & Kreindler's contention (at 59-60), Judge Netburn reasonably rejected as implausible Kreindler's testimony that on June 28 he called Fawcett after speaking to Isikoff to ask whether the transcripts could be shared

It was that Kreindler's version of events painted Fawcett as a skilled deceiver – telling Kreindler that the documents could not be shared but then leaking them himself, and alternating seamlessly between calls with Kreindler about their shared work and communications with Crotty about his betrayal of Kreindler. SPA42-43. "[H]aving witnessed Fawcett on the stand," she did not believe he had such skill. SPA43. That assessment is reinforced by Fawcett's two inconsistent false explanations for the calls with Crotty – first, that they had not discussed the leak at all, and then that he contacted Crotty because he "saw the court order," even though no such order then existed. SPA22, SPA43.[17]

**d.** Kreindler & Kreindler's so-called internal investigation had a "clear blind spot" for Fawcett and "completely . . . passed over" him. SPA43-44. That included never "directly question[ing]" Fawcett "about his role in the breach,"

with Isikoff. SPA13. Kreindler testified under oath that he was "very familiar with the terms" of at least the FBI Protective Order. JA67 (Tr. 18:17). Judge Netburn could reasonably accept that statement and reject his testimony that he had sought guidance about the order from a non-lawyer subordinate.

[17] Kreindler & Kreindler misplaces reliance (at 22-23) on a post-hearing declaration from Pounian stating that he was on the July 22 call. The declaration was hearsay, and Judge Netburn reasonably declined to accept it. As she also observed, the declaration "undercut Kreindler's testimony" by stating that the call was about a response to Saudi Arabia's July 21 email, contrary to Kreindler's protestations that it was not about the leak. SPA21 n.8; *see also* SPA78-79 (Pounian's declaration "contradicts previous statements from Fawcett and Jim Kreindler because Saudi Arabia's email was explicitly about the leak, so coordinating a 'response to Saudi Arabia's email' necessarily concerns the leak").

SPA44; never following up on Fawcett's known communications with Isikoff, SPA17; and never asking Fawcett to sign a declaration until the "absolute deadline" set by court order, SPA44. If Kreindler and his colleagues had truly thought Fawcett was innocent, they had every reason to dispel the suspicion directed at their firm by questioning him and obtaining a declaration from him sooner. The firm's avoidance of such measures is far better explained as a showing of "reciprocal loyalty" to Fawcett, SPA48, protecting him as long as possible.

**2.** Kreindler & Kreindler's assertion (at 51) that "[t]here was no direct evidence of Firm involvement in the leak" is untrue: Kreindler conceded on the stand that the firm leaked the transcript. JA68 (Tr. 19:1-4) (admitting "that these violations of two court orders were committed by Kreindler & Kreindler"). He denied only personal knowledge of it. The court's reliance on circumstantial evidence to prove that Kreindler actually did know of the leak was appropriate because " '[k]nowledge' is a fact often established – even in criminal cases where the prosecution's burden is beyond a reasonable doubt – simply through circumstantial evidence." *E.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83 (2d Cir. 2005). Further, the firm's attempts (at 49-50) to marshal contrary evidence are misplaced under a clear-error standard of review. *See AMR Servs. Corp. v. International Bhd. of Teamsters*, 821 F.2d 162, 163 (2d Cir. 1987) (per curiam)

("evidence from which a contrary inference could have been drawn" does "not entitle[ ]" a court of appeals "to overturn the inference that was drawn").

**a.** Judge Netburn was not required (as Kreindler & Kreindler contends, at 49) to credit Maloney's and Pounian's self-serving testimony that they each asked Fawcett whether he leaked the transcript. She could instead accept Fawcett's testimony that he did not recall either of them asking him, JA488 (Tr. 439:7-9 (Maloney), 439:10-12 (Pounian)), combined with the undisputed facts that, when finally required to submit a declaration to the court, Fawcett "confessed immediately," SPA89; and that Fawcett revised his September 27 declaration to remove the statement (drafted by Pounian and Benett) that, "[u]ntil today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff[ ] had obtained the transcript," SPA31.[18] In light of the finding that no one ever asked Fawcett the

[18] Kreindler & Kreindler mischaracterizes the record in contending (at 11, 54) that Maloney's testimony is "corroborat[ed]" by an email he sent to Hartney on July 15. That email states: "John F sent a copy to Consultant [redacted] (which is fine) but did not see any other." JA938. But Maloney testified that he did *not* speak to Fawcett "one-on-one" on July 15, the day that the article was published. JA264-265 (Tr. 215:17-216:14) (testimony about "discussions on July 15" in which Maloney "posed a question to the entire group and . . . got negative responses in general" but did not ask "one-on-one" questions "that first day"). Judge Netburn accepted that Maloney had "informally ask[ed] a group of people associated with the case collectively if they knew who leaked the transcript." SPA16. The testimony that she rejected is that Maloney later asked Fawcett "face-to-face . . . whether he leaked the transcript." JA265-266 (Tr. 216:24-217:2); *see* SPA17. The July 15 email refers to the July 15 informal group discussion and does not corroborate Maloney's testimony that, on some later unidentified date, he asked Fawcett personally and directly.

key questions, Kreindler & Kreindler's further assertions (at 49) that Fawcett remained "silent" during the investigation and ultimately "stopped responding" to questions ring hollow.

**b.** Nor does it show Kreindler's innocence, as his firm contends (at 49-50), that Fawcett continued to communicate with Isikoff after the July 15 publication, but that Kreindler did not; or that Fawcett repeatedly sought advice from his own defense counsel. Kreindler had ample reason to distance himself from Isikoff after Isikoff's article revealed the leak. And Fawcett had ample reason to want his own lawyer after violating a court order at Kreindler's express or tacit direction. Further, if Fawcett had acted on his own, he would have had no reason to endanger himself by giving false testimony on the stand about his July 22 conversations with Crotty. *Supra* pp. 12-13. Fawcett gave that testimony because he needed to conceal that Kreindler knew Fawcett was getting a lawyer or told him to do so – which showed Kreindler's knowledge of Fawcett's role in the leak.

**c.** Judge Netburn was not, as Kreindler & Kreindler suggests (at 50), required to accept the version of events in Fawcett's original declaration. *See Hyman v. Brown*, 927 F.3d 639, 661-62 (2d Cir. 2019) (explaining that "a factfinder [has] discretion to credit parts of a witness's testimony despite discrediting others"). It is plausible that Fawcett was unwilling to deny the leak itself under oath but still willing to lie or mislead to protect Kreindler & Kreindler or to protect James

Kreindler personally. After all, Fawcett signed the declaration after Benett and Pounian revised it to shift blame away from the firm, even though it made false and misleading statements about the nature of and motive for the leak. *Supra* pp. 19-20.[19]

### B. Kreindler & Kreindler Failed To Conduct a Reasonable Investigation and Obstructed the Court's Investigation

**1.** The record supports the district court's conclusion that Kreindler & Kreindler's purported investigation of the leak was "lackadaisical," "paltry," and "facially deficient." SPA43, SPA45, SPA48. The investigation's defects included (1) "prejudg[ment]" and unjustified "confiden[ce] that Kreindler & Kreindler was not the source of the leak"; (2) reliance on informal questioning in a group setting; (3) disregard for document retention until outside counsel was retained; (4) insufficient document searches and failure to follow up on them; (5) failure to account for firm-wide "access" to the transcript through the "Case Media" system; (6) failure to check firm phone records; (7) failure to search personal devices or outside cloud-based systems; and (8) absence of any "forensic" efforts. SPA16-20,

[19] Judge Netburn's finding that Benett and Pounian introduced misleading statements about whether Fawcett sent the whole declaration to Isikoff and about whether Fawcett had a personal motive related to his children is supported by her examination of email and phone records showing that Pounian and Benett made these edits on September 27, between 12:20 p.m. and 1:47 p.m., and that there were no calls between Fawcett on the one hand, and Pounian or Benett on the other, during that time. SPA31.

SPA43-44; *see supra* pp. 8-11. Maloney, a former federal prosecutor, knew how to conduct a professional investigation. JA274 (Tr. 225:7-12). Judge Netburn reasonably inferred that he did not conduct one here because he wanted to remain "willfully unaware" of what one would reveal – or already knew and was "active[ly] collu[ding] in a cover-up." SPA43.

Nor can Kreindler & Kreindler credibly claim (at 53) that Judge Netburn unfairly criticized the firm for not taking steps that other firms did not perform, such as reviewing personal devices. No other firm had any relevant contact with Isikoff during the critical time surrounding the Al Jarrah deposition. *E.g.*, JA15; JA18; JA22; JA25; JA27; JA29-30. By contrast, Kreindler had phone contacts with Isikoff on June 21, 25, and 28; appeared on Isikoff's podcast on July 10 and discussed, among other things, the ongoing depositions; and admittedly knew that Isikoff and Fawcett had been in direct contact. *Supra* pp. 6-8. Maloney's initial searches of the firm's email server also turned up many communications between Isikoff and Kreindler, and Isikoff and Fawcett, some of which suggested earlier communications. SPA19-21 (citing JA211-212 (Tr. 162:12-163:6), JA284-287 (Tr. 235:17-236:17, 237:3-238:11)). Thus, unlike the other firms that had access to the Al Jarrah transcript, Kreindler & Kreindler had substantial reason to believe

that there were communications with Isikoff on the personal devices of the firm's lawyers and staff.[20]

**2.** The record also supports the district court's conclusion that Kreindler & Kreindler willfully obstructed the court's investigation into the leak. As shown above: (i) Kreindler & Kreindler misled the court by joining the July 27, 2021 letter stating that it was "confident that it was not the source of the leak," when Kreindler knew otherwise and when Maloney knew (at least) that the firm's investigation was incomplete; (ii) the firm chose not to submit declarations setting forth communications with Isikoff and describing its investigative steps, even though three other PEC firms had done so; (iii) after the court ordered the firm to submit initial declarations, it submitted "deficient" ones that were "substantially vaguer and less comprehensive" than those of other PEC firms, with "virtually no detail" about the firm's purported investigation; and (iv) after the court ordered the firm to submit more detailed declarations, it filed declarations containing "numerous misleading or false statements" including intentionally false statements about who could access the confidential Al Jarrah transcript and false statements and omissions about Kreindler's interactions with Isikoff. *Supra* pp. 14-18.

[20] Kreindler & Kreindler suggests (at 53-54) that its investigation could not have discovered Fawcett as the leaker because Fawcett would have lied and destroyed evidence. Of course, when forced to answer questions under oath, he did no such thing. In any event, speculation that reasonable investigative efforts might have failed is no excuse for not making those efforts in the first place.

Even when Kreindler & Kreindler finally revealed that it was the source of the leak, Benett and Pounian revised Fawcett's declaration to give the impression that he sent only portions of the transcript to Isikoff and fabricated a motive for the leak. *Supra* pp. 18-20. Then, at the hearing, Kreindler, Maloney, Benett, Pounian, and Fawcett each gave false or misleading testimony. *Supra* pp. 47-48 & n.15.

The firm's assertion (at 55-56) that it had safety concerns about the identity of a consultant with access to the transcript justifies neither its decision to withhold any declarations in the first instance, nor its knowingly false and misleading declarations in response to the district court's August 12 Order, nor its knowingly false and misleading declarations in response to the August 30 Order, nor its attorneys' lack of candor on the stand. In any event, the firm could have asked the court to keep the consultant's name *ex parte* and under seal, as it ultimately did. Judge Netburn granted that request. JA39.

* * *

Kreindler & Kreindler does not challenge the appropriateness of the sanctions imposed under the four-factor test customarily used in this Circuit. *See Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (per curiam); SPA49-63; SPA93-95. Accordingly, if this Court concludes (as it should) that the district court acted within its legal authority and made no clear error of fact, it should affirm the order in its entirety.

## CONCLUSION

The Court should dismiss the appeal for lack of appellate jurisdiction. In the alternative, the Court should affirm the district court's order.

Respectfully submitted,

/s/ *Michael K. Kellogg*

Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

September 19, 2024

# CERTIFICATE OF COMPLIANCE

1. The foregoing Brief for Appellee Kingdom of Saudi Arabia complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4)(A), because this Brief contains 13,885 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2. The foregoing Brief for Appellee Kingdom of Saudi Arabia complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Brief has been prepared in proportionally spaced typeface using Microsoft Office Word 365 in 14 point Times New Roman.

Dated: September 19, 2024 By: /s/ *Michael K. Kellogg*
Michael K. Kellogg